**COMMONWEALTH ALUMINUM CORPORATION and Enterprise Metal Corporation, Plaintiffs,**

v.

**BALDWIN CORPORATION, a/k/a Baldwin Street Corporation, f/k/a American Highway Sign Corporation; Gary S. McMahon; Amsign Corporation; Jecon Metals Corporation; and Richard Golber, Defendants.**

**Civil Action No. 94–30265–MAP.**

United States District Court,
D. Massachusetts.

Sept. 16, 1997.

(1st Cir.1982); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986).

William R. Grimm, Mary P. Murray, Hinckley, Allen, Snyder & Comen, Evan Slavitt, Gadsby & Hannah LLP, Boston, MA, for plaintiff.

C. Brian McDonald, Jerome M. Scully, Bulkley, Richardson & Gelinas, Mark E. Draper, Annino, Draper & Moore, P.C., Springfield, MA, Carl D. Aframe, Law Office of Carl D. Aframe, Worcester, MA, for defendants.

PONSOR, District Judge.

Upon *de novo* review this Report and Recommendation is hereby adopted. Docket Nos. 11 and 72 are ALLOWED as to Counts I–IV and IX, and otherwise DENIED. Docket No. 92 is DENIED. The clerk will schedule a status conference. So ordered.

*REPORT AND RECOMMENDATION REGARDING MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS FRANK MARKOWITZ, AMSIGN CORPORATION AND JECON METALS CORPORATION (Docket No. 11); PARTIAL MOTION TO DISMISS OF DEFENDANTS AMSIGN CORPORATION AND JECON METALS CORPORATION (Docket No. 72, as supplemented by Docket No. 103); and DEFENDANT GARY S. MCMAHON'S MOTION FOR SUMMARY JUDGMENT*

NEIMAN, United States Magistrate Judge.

## I. *INTRODUCTION*

This is a complex commercial contract case with an equally complex procedural history. Plaintiffs are Commonwealth Aluminum Corporation ("Commonwealth") and Enterprise Metal Corporation ("Enterprise") (together "Plaintiffs"). Defendants are Baldwin Corporation, a/k/a Baldwin Street Corporation and f/k/a American Highway Sign Corporation ("AHS") (hereinafter "AHS"); Amsign Corporation ("Amsign"); Jecon Metals Corporation ("Jecon"); Gary S. McMahon ("McMahon"); and Richard Golber.

Several dispositive motions have been referred to this Court for a report and recommendation, *see* 28 U.S.C. § 636(b)(1)(B), including Amsign and Jecon's partial motion to dismiss the amended complaint (Docket No. 72, as supplemented by Docket No. 103) and McMahon's motion for summary judgment (Docket No. 92). Also referred to this Court for a report and recommendation is a motion for summary judgment filed by Amsign, Jecon and Frank Markowitz ("Markowitz"), an original defendant, on June 7, 1995. (Docket No. 11.) In a memorandum and order dated October 3, 1995, this Court granted Plaintiffs' motion for a Rule 56(f) continuance and, as such, has held Docket No. 11 in abeyance. Since then, however, the complaint was amended, the original counsel for the movants withdrew and Markowitz was dismissed from the case. Even so, Docket No. 11 is technically still outstanding and, as such, is addressed herein.

Just prior to oral argument Amsign filed a suggestion of bankruptcy. Accordingly, all actions against Amsign have been stayed, see 11 U.S.C. § 362(a), and the motions were argued only insofar as they related to Jecon and McMahon. This report and recommendation is similarly circumscribed.[1]

## II. *FACTUAL BACKGROUND*

The Court first sketches the background facts, providing further details later as they become relevant to the discussion. The Court reviews the facts favorably to Plaintiffs, or, if against them, if not rebutted. See Pilgrim v. Trustees of Tufts College, 118 F.3d 864, 866 (1st Cir.1997).

AHS, a highway sign manufacturing company, was incorporated in 1981. During its active existence, AHS was known as "Amsign," a trade name which was used on various documents. During this time, Ronald Whitaker ("Whitaker") was the president and fifty-one percent shareholder of AHS while McMahon was the vice-president and forty-nine percent shareholder.

Plaintiffs had been supplying AHS with their product since at least 1992. AHS placed orders for the product by telephone or by purchase order and, in accordance

---

1. With regard to the remaining defendants, Richard Golber has not filed a dispositive motion and AHS has yet to respond to the complaint.

with industry custom, Plaintiffs sent invoices to AHS contemporaneously with shipments. In 1993, AHS consistently failed to make timely payments for product received from Plaintiffs even though Plaintiffs were given various assurances that funds would be forthcoming. In the summer of 1993, these assurances included, among other things, representations by McMahon that AHS would be sold to Jecon—an aluminum trading company where Markowitz was president and Robert Sayour was an officer and employee—and that Jecon would take care of AHS' debts. Meanwhile, apparently unbeknownst to Plaintiffs, other things were happening to AHS.

In 1991 or 1992, Shawmut Bank ("Shawmut") became concerned with the amount of money being withdrawn from AHS. In an effort to appease Shawmut, Whitaker formed Amsign Marketing Corporation ("Amsign Marketing") to act as a sales arm of AHS. In late 1992 or early 1993, Whitaker and McMahon began to discuss selling AHS. Apparently the two were having disagreements and AHS needed cash to meet its obligations. In addition, during the spring and summer of 1993, AHS, although current in its payments to Shawmut, was in violation of an assets-to-liabilities covenant.

In late 1992 or early 1993, Richard Golber ("Golber") was introduced to AHS as a prospective purchaser. After touring AHS's facility, Golber and his wife, Constance Katz–Golber ("Katz–Golber"), had a number of conversations with both Whitaker and McMahon. During one of those conversations, a determination was made that Katz–Golber would purchase AHS through an un-determined investment vehicle. Katz–Golber and her brother, Jeffrey Katz ("Katz"), are co-owners of Jecon.[2]

Ultimately, Amsign was incorporated in July of 1993 for the purpose of acquiring the assets of AHS. Whitaker began as the president and sole shareholder of Amsign. On September 13, 1993, Amsign purchased AHS's assets in a transaction orchestrated by Shawmut.

Although Amsign was incorporated in July of 1993, it did not become active until after the September 13, 1993, asset sale and had limited financial resources up to that time. Katz–Golber came on Amsign's board after September 13, 1993, when she paid Amsign $200,000 for 5,100 shares. She is now the chairperson, treasurer, clerk and majority shareholder of Amsign, while Golber is Amsign's CEO and vice-chairperson and Whitaker is a forty-six percent shareholder.

During all relevant periods, Markowitz was both Jecon's president as well as Amsign's director and assistant clerk. When dealing with various Commonwealth officials, Markowitz purportedly identified himself as being from Jecon and, on at least one occasion, made oral representations that Jecon would pay for a shipment to AHS.

Robert Sayour ("Sayour"), as well, was involved in the management of both Amsign and Jecon during the summer and fall of 1993. Prior to the asset sale, Sayour assertedly operated out of Jecon's offices, expected to have calls returned there and made several representations to Plaintiffs on Jecon's behalf. After the asset sale, Sayour alleged-

---

**2.** At one point during the negotiations the parties considered that one of Katz–Golber's other companies, Moonglow Investments, Inc., ("Moonglow"), would purchase the stock of AHS. After some 'wrangling, it was contemplated that Moonglow would have a fifty-one percent ownership interest in the new company, while Whitaker and McMahon would each retain a twenty-four and one-half percent stake; however, when McMahon became disillusioned, Moonglow proposed to purchase McMahon's interest in AHS. The parties also considered, as late as July, 1993, an asset sale between AHS and an entity called "Amsign Acquisition Corporation," whereupon Amsign Acquisition was to assume certain of AHS's trade payables and AHS would relinquish its trade name and the name "Amsign." Indeed, in July of 1993, there was a discussion that Amsign Acquisition would hire McMahon; a draft employment agreement, printed on Jecon stationery and faxed from Jecon's offices, was sent from Katz–Golber's attorney to McMahon's attorney on July 14, 1993. If the deal could not be arranged through Shawmut, Golber agreed to purchase the assets from McMahon and Whitaker directly. Both the stock purchase by Moonglow and the asset sale to Amsign Acquisition were eventually abandoned. Golber and Katz–Golber apparently were concerned about an environmental problem at the AHS facilities and other "skeletons in the closet," *e.g.*, unknown liabilities and pending litigation.

ly represented that he was acting on behalf of both Amsign and Jecon.

## III. *PROCEDURAL BACKGROUND*

This case has an unusually long procedural history. Plaintiffs filed this action in November of 1994 against McMahon, AHS, Amsign, Jecon and Markowitz. The original complaint asserted ten counts sounding in breach of contract and fraud.[3] As indicated, a motion for summary judgment on five of the original counts (Counts V, VII, VII[sic], IX and X) remains outstanding.

On August 7, 1996, Plaintiffs amended the complaint to assert new claims against McMahon, AHS (now Baldwin Corporation, a/k/a Baldwin Street Corporation), Amsign, Jecon and Golber. Markowitz was dismissed with prejudice as were three of the original counts (Counts V, VI and IX). The amended complaint asserts nine counts.[4]

On September 24, 1996, pursuant to Fed. R.Civ.P. 12(b)(6) (failure to state a claim) and 12(c) (judgment on the pleadings), Amsign and Jecon moved to dismiss Counts II and IV of the amended complaint. (Docket No. 72.) Before that motion was resolved, however, counsel for Amsign, Jecon and Golber filed a motion to withdraw on December 6, 1996. The motion to withdraw was allowed on January 6, 1997. In the meantime, on December 19, 1996, McMahon filed a Rule 56(c) motion for summary judgment as to the two counts asserted against him. (Docket No. 92.) Plaintiffs filed an opposition to McMahon's motion on January 17, 1997, to which McMahon filed a reply brief on February 10, 1997.

On January 31, 1997, Amsign and Jecon— represented by new counsel, who also now represents Golber—filed a supplemental memorandum of law in support of their motion to dismiss Counts II and IV of the amended complaint. (Docket No. 103.) The supplemental memorandum also seeks dismissal of Counts I, III and V through IX of the amended complaint insofar as those counts relate to Amsign and Jecon. Plaintiffs filed an opposition to the supplement on February 21, 1997. Oral argument, which was held on May 7, 1997, proceeded only as to Jecon and McMahon, Amsign having filed a suggestion of bankruptcy on March 24, 1997.

## IV. *SUMMARY JUDGMENT STANDARDS* [5]

A court may grant summary judgment pursuant to Rule 56(c) if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also National Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 735 (1st Cir.1995). Once the moving party has demonstrated that no genuine issue of material fact exists, the burden is on the opposing party to contradict the demonstration "by pointing to specific facts demonstrating that there is, indeed, a trialworthy issue." *National Amusements,* 43 F.3d at 735.

A "genuine" issue is one "that a reasonable jury could resolve . . . in favor of the non-moving party." *McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir.1995).

---

**3.** Counts I–IV of the original complaint were breach of contract and quantum meruit counts directed at AHS. Counts V and VI were breach of guaranty claims targeting Jecon, Amsign and McMahon. Counts VII and X were misrepresentation and M.G.L. ch. 93A claims asserted against all four original defendants. Count VII[sic] was an estoppel claim directed at AHS, Jecon and Amsign. Finally, in Count IX Plaintiffs asked for a constructive trust against Amsign.

**4.** Counts I–IV of the amended complaint are breach of contract and quantum meruit counts directed at AHS, Jecon and Amsign. Count V is a misrepresentation claim targeting McMahon, AHS, Jecon and Golber. Count VI is an estoppel

claim directed at AHS, Jecon and Amsign. Count VII asserts that all five of the remaining Defendants violated M.G.L. ch. 93A. Finally, Counts VIII and IX are declaratory judgment counts targeting Amsign and Jecon respectively.

**5.** Although Rules 12(b)(6), 12(c) and 56(c) have all been invoked, the parties have not objected to the suggestion made at oral argument that the outstanding dispositive motions all be construed under summary judgment standards, particularly given the age of the case, the parties' reliance on materials outside the pleadings and the volume of discovery. See Rules 12(b)(6) and 12(c) (indicating that motions made under these rules may also be analyzed under Rule 56(c)).

*Accord United States v. One Parcel of Real Property (Great Harbor Neck, New Shoreham, R.I.),* 960 F.2d 200, 204 (1st Cir.1992). Not every genuine factual conflict, however, necessitates a trial. " 'It is only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared.' " *Parrilla–Burgos v. Hernandez–Rivera,* 108 F.3d 445, 448 (1st Cir.1997) (*quoting Martinez v. Colon,* 54 F.3d 980, 983–84 (1st Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 515, 133 L.Ed.2d 423 (1995)).

## V. *DISCUSSION*

In light of the procedural history of this case, only the following counts—and only insofar as they are asserted against Jecon and McMahon—are at issue: Counts VII, VII[sic] and X of the original complaint and Counts I through VII and IX of the amended complaint. Because several of these counts depend, at least in part, on an analysis of Plaintiffs' declaratory judgment claim, Count IX of the amended complaint, that claim is addressed first.

### A. Declaratory Judgment

Count IX of the amended complaint seeks a declaration that Jecon is liable to Plaintiffs for AHS's debts. Jecon asserts that Count IX must be dismissed as Plaintiffs cannot prove a necessary connection between AHS and Jecon; that is, Plaintiffs are unable to show either (1) that Jecon is the continuation of AHS or (2) that Amsign is the continuation of AHS and that Jecon is connected to Amsign as its "alter ego." The Court agrees with Jecon on both theories.

 Plaintiffs' first theory can be dealt with in short order. In Massachusetts, one may acquire, in an asset sale, the debts and liabilities of a company where the purchaser is "merely a continuation" of the seller. *McCarthy v. Litton Industries, Inc.,* 410 Mass. 15, 570 N.E.2d 1008, 1012 (1991); *see Guzman v. MRM/Elgin,* 409 Mass. 563, 567 N.E.2d 929, 931 (1991); *Dayton v. Peck, Stow & Wilcox Co.,* 739 F.2d 690, 692 (1st Cir.1984). Here, Jecon was never a party to the sale of AHS's assets. Accordingly, Jecon

cannot be deemed the continuation of AHS. Indeed, Plaintiffs have not pressed this theory with any force.

Plaintiffs' second theory—that Jecon, *through Amsign,* is liable for AHS' debts—although requiring slightly more attention, is equally unpersuasive. In order to show that Jecon is liable under this theory, Plaintiffs have to first demonstrate that Amsign is a continuation of AHS and then pierce the alleged corporate veil between Amsign and Jecon. Assuming, *arguendo,* that Amsign is a continuation of AHS—an assumption even Amsign's counsel acknowledged at oral argument has some strength—Plaintiffs' attempt to pierce Amsign's veil to get at Jecon comes up short.

 Under Massachusetts law, it is permissible to disregard separate corporate entities, *i.e.,* to pierce a corporate veil, in "rare particular situations in order to prevent gross inequity." *My Bread Baking Co. v. Cumberland Farms, Inc.,* 353 Mass. 614, 233 N.E.2d 748, 752 (1968). *See Spaneas v. Travelers Indem. Co.,* 423 Mass. 352, 668 N.E.2d 325, 326 (1996); *Evans v. Multicon Constr. Co.,* 30 Mass.App.Ct. 728, 574 N.E.2d 395, 398 (Mass.App.Ct.), *rev. denied,* 410 Mass. 1104, 577 N.E.2d 309 (1991). Because piercing "is the exception, not the rule," however, plaintiffs "must meet a very high standard" before they will be allowed to disregard a corporate form. *American Home Assur. Co. v. Sport Maska, Inc.,* 808 F.Supp. 67, 73 (D.Mass.1992). As the First Circuit has explained: "Successful invocation of the alter ego doctrine requires a showing that businesses, although separately incorporated, have been operated in so imbricated a manner as to justify a reasonable perception that they [are] one and the same." *United Elec., Radio & Mach. Workers of America v. 163 Pleasant Street Corp.,* 960 F.2d 1080, 1095–96 (1st Cir.1992).

 It is permissible to pierce an alleged veil when there is either "a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the matter and capacity in which the various corporations and their re-

spective representatives are acting." *My Bread*, 233 N.E.2d at 752. *See also Pepsi–Cola Metropolitan Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 15 (1st Cir.1985); *Evans, supra.* In deciding whether to penetrate the corporate form, twelve factors are to be considered: (1) common ownership; (2) pervasive control; (3) confused intermingling of business activity, assets or management; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) nonpayment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporate assets by the dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud. *Pepsi–Cola*, 754 F.2d at 14–16; *Evans*, 574 N.E.2d at 398.

■ In the case at bar, even after significant discovery, Plaintiffs cannot sufficiently establish any of the twelve factors. First, Jecon and Amsign are not totally owned in common. Thus, notwithstanding Katz–Golber's interest in the two companies and her marriage to Golber, each company is partially owned by another individual. Similarly, although there has been some overlap in the management of Jecon and Amsign, e.g., Markowitz and Sayour, and maybe a question as to the capacity these men were acting in the summer of 1993, there has been no demonstration of "pervasive" control between the two companies. *See American Home*, 808 F.Supp. at 73 (that two corporations "share common officers, by itself, is not enough to support an alter ego theory") (citations omitted). Finally, there is no absolutely no proof offered by Plaintiffs of intermingling of business activity or assets, thin capitalization, nonobservance of corporate formalities, absence of corporate records, nonpayment of dividends, insolvency at the time of the transaction (Amsign's current bankruptcy filing notwithstanding), siphoning of assets, nonfunctioning of officers and directors, or that a shell corporation was used to promote a fraud.

Still, despite the paucity of evidence to support their piercing claim, Plaintiffs argue that there is, at least, a genuine issue of material fact in this regard. The Court disagrees. Given the overwhelming distinctions between Jecon and Amsign, no reasonable jury could find, in light of the factors listed above, either a "confused intermingling" or a "serious ambiguity" between the two corporations. *See Gottlin v. Herzig*, 40 Mass.App. Ct. 163, 662 N.E.2d 706, 710 (1996) (refusing to pierce an alleged veil at summary judgment even though defendants owned and controlled a minimally capitalized corporation which paid both rent and defendants' salaries), *rev. denied*, 422 Mass. 1107, 664 N.E.2d 1197 (1996); *American Home*, 808 F.Supp. at 73 (finding insufficient facts to warrant piercing where, at most, defendants shared officers of corporation and one defendant was parent of corporation); *Evans*, 574 N.E.2d at 400 (refusing, as a matter of law on a postjudgment motion, to disregard a corporate form even though four factors pointed in favor of piercing). Jecon is therefore entitled to summary judgment on Count IX of the amended complaint.

### B. Breach of Contract and Quantum Meruit

■ Having determined that Jecon is neither a continuation of AHS nor liable, through Amsign, for AHS's debts, Plaintiffs' breach of contract and quantum meruit claims against Jecon (Counts I through IV of the amended complaint) quickly wither.[6] The breach of contract claims (Counts I and III) fail because of the statute of frauds. Under Massachusetts law, "a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." M.G.L. ch. 106, § 2–201(1). Here, there is no written agreement, signed by Jecon, evidencing a contract which is enforceable between Jecon and Plaintiffs. *Cf. Logan Equip. Corp. v. Simon Aerials, Inc.*,

---

**6.** Indeed, Plaintiffs acknowledge that these counts are based on an assumption that Jecon is somehow responsible for AHS's debts. (*See* Pls.' Opp'n to Partial Mot. to Dismiss of Defs.' Jecon and Amsign (Docket No. 78) at 5; Pls.' Reply to Defs.' Summ. J. Mot. (Docket No. 109) at 2.)

736 F.Supp. 1188, 1206 (D. Mass. 1990) (after refusing to pierce alleged veil, court was unwilling to hold defendant liable for contract to which it was not a party).

■■■ The quantum meruit claims (Counts II and IV) fail because Plaintiffs cannot demonstrate a required element of these counts. Recovery may be had in quantum meruit, of course, in the absence of a legal or enforceable contract. *See Kass v. Todd,* 362 Mass. 169, 284 N.E.2d 590, 594 (1972); *Fay, Spofford & Thorndike, Inc. v. Mass. Port Auth.,* 7 Mass.App.Ct. 336, 387 N.E.2d 206, 209 (Mass.App.Ct.1979). *See also Mass Cash Register, Inc. v. Comtrex Sys. Corp.,* 901 F.Supp. 404, 423 (D.Mass. 1995). One essential element for recovery in quantum meruit, however, is that the plaintiff conferred a measurable benefit on the defendant. *Mass Cash Register,* 901 F.Supp. at 423; *Bolen v. Paragon Plastics, Inc.,* 747 F.Supp. 103, 106–07 (D.Mass.1990). In this case, once it is determined that Jecon is neither a continuation of AHS nor liable through Amsign, there is no evidence that Plaintiffs conferred a measurable benefit on Jecon. Jecon is thus entitled to summary judgment on Counts I through IV of the amended complaint.

### C. Misrepresentation

In Count VII of the original complaint and Count V of the amended complaint, Plaintiffs assert that McMahon and Jecon falsely represented that Plaintiffs would be paid in full for all shipments of product at a time and in a context in which McMahon and Jecon knew, or should have known, that Plaintiffs would rely upon these representations. Plaintiffs go on to claim that they did, in fact, detrimentally rely upon these representations by, *inter alia,* releasing credit holds (referred to in the complaint as releasing " 'stop' shipment orders"), delaying action to recover account balances (referred to in the complaint as "forbearing from instituting litigation") and continuing to ship product to AHS. (See Amended Compl. ¶¶ 67 and 70.)

In short, Plaintiffs claim that McMahon and Jecon owed them a duty of care not to deceive them. The Court addresses McMahon and Jecon separately.

### 1. McMahon

During the spring and early summer of 1993, McMahon informed various representatives of Plaintiffs that AHS was to be sold and that the purchaser, eventually identified as Jecon, would pay the amounts outstanding to them. Statements McMahon allegedly made to Commonwealth officials—Jerry Price ("Price"), Laurie McConnell ("McConnell") and Steve Williamson ("Williamson")— included the following: (i) that AHS was to be purchased by a financially sound, large, reputable aluminum company, later identified as Jecon; (ii) that McMahon would be running the new company at the old premises; (iii) that Commonwealth would be paid in full when the sale took place; and (iv) that, although McMahon would continue to have responsibility for the company, Sayour (who was involved in the management of both Jecon and Amsign) would be in charge of coordinating purchases and materials. Statements McMahon allegedly made to Arthur Raskin ("Raskin") and Gary Murch ("Murch") of Enterprise included the following: (i) that Jecon, a company with substantial assets, would be purchasing all of AHS, not just its assets, in July (later changed to August, then September) of 1993; (i) that Enterprise need not be concerned about the payment status of AHS; (iii) that a bulk sale notice would be sent out prior to the consummation of the sale; (iv) that all debts of the unsecured creditors would be paid in full upon AHS's sale; and (v) that McMahon had agreed with Jecon to become a Jecon employee.

■■■ In making a misrepresentation claim, a plaintiff must prove: that the defendant made a misrepresentation of fact to the plaintiff; that the misrepresentation was intended to induce the plaintiff to act upon it; that the defendant knew, or should have known through a modicum of diligence, that the representation was false; that the plaintiff acted in reliance upon the misrepresentation; and that damages resulted from the misrepresentation. *See Graphic Arts Finishers, Inc. v. Boston Redevelopment Auth.,* 357 Mass. 40, 255 N.E.2d 793, 796 (1970); *Zimmerman v. Kent,* 31 Mass.App.Ct. 72,

575 N.E.2d 70, 74 (1991). *See also Nickerson v. Matco Tools Corp.*, 813 F.2d 529, 530 (1st Cir.1987). McMahon's argument focuses on two of the elements. He claims that Plaintiffs cannot establish either that they detrimentally relied upon his representations or that his representations were false. Therefore, McMahon argues, Plaintiffs' misrepresentation claims must fail.

In opposition, Plaintiffs claim that—in addition to releasing product from credit hold, delaying action to recover account balances and continuing shipments of product, the detrimental reliance alleged in the complaint—Commonwealth accepted additional orders from AHS and refrained from lowering AHS's credit limit and that Enterprise arranged for credit. Plaintiffs did these things, they both assert, in reliance on McMahon's statements that AHS would be sold and that Jecon would take care of their debts.

### a. Detrimental Reliance

■ According to McMahon, the complaint alleges that his representations resulted in Plaintiffs doing only three things: continuing to ship product to AHS, releasing AHS's credit holds and delaying action to recover outstanding account balances. Thus, McMahon argues, Plaintiffs cannot now claim other instances of detrimental reliance, *e.g.*, Commonwealth's accepting new orders and refraining from reducing AHS's credit limit and Enterprise's making credit decisions.

McMahon's argument misses the mark. For one, McMahon points to no law limiting a party asserting misrepresentation to the examples of detrimental reliance alleged in the complaint. Indeed, the liberal pleading requirements of the federal rules appear to allow otherwise. *See generally* Fed.R.Civ.P. 8(a).[7] Similarly, McMahon fails to note that the complaint uses the term *"inter alia,"* (defined as "among other things," Black's Law Dictionary (6th ed.1990)), when enumerating the claimed instances of detrimental reliance.

McMahon goes on to assert that, in any event, at least three of the five examples of Commonwealth's alleged detrimental reliance—releasing product from credit hold, continuing shipments of product and accepting new orders—have no factual support given "clear and unambiguous" deposition testimony by McConnell, Commonwealth's former credit manager and Rule 30(b)(6) deponent.[8] At most, McMahon asserts, McConnell's testimony reveals that Commonwealth's reliance was based on McMahon's representations that payments would be made and not on his representations that AHS would be sold.

■ McMahon's argument cuts the evidence too thinly. For example, he fails to acknowledge that other testimony by McConnell evidences that Commonwealth released product from credit hold, continued to ship product and accepted new orders *because of the proposed new ownership of AHS*. (*See, e.g.*, McConnell depo., vol. II at 43–45; McConnell depo., vol. I at 42–43, 119–20 and

---

7. Granted, Rule 9(b), which is not cited by McMahon, states that "the circumstances constituting fraud" are to be plead with particularity. However, the reference to "circumstances" is only to matters such as the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby. 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1297 at 590 (2d ed.1990). It does not, ostensibly, refer to instances of detrimental reliance.

8. The following exchange occurred during the second day of McConnell's deposition:

Q: Do you recall any instance from the summer of 1992 through 1993 where a shipment of aluminum was released at Mr. McMahon's request without bringing his account current?
A: No sir.

. . . .
Q: . . . So the decision to not take any more orders and to possibly divert the trucks for the July deliveries was changed as a result of Mr. McMahon keeping his promise to make certain payments on time?
A: Yes, for that situation.

. . . .
Q: So the accepting of orders and the releasing of shipment was all tied to whether or not you received payments as promised by Mr. McMahon?
A: That is correct.

. . . .
Q: . . . What aluminum was shipped to [AHS] as a result strictly of Mr. McMahon's representing to you that the company was being sold?
A: None.
(McConnell depo., vol. II at 28, 44 and 71.)

Ex. C thereto). Further, McMahon does not acknowledge that Price, a Commonwealth official, unambiguously averred that Commonwealth accepted new orders "based on McMahon's statements to [him] that the new group would be purchasing [AHS]." (Price Aff. (Docket No. 24) ¶¶ 7–8.) Finally, he overlooks other evidence that Commonwealth refrained from lowering AHS's credit limit and delayed action to recover outstanding account balances based on representations, some by McMahon, that AHS was being sold. (*See, e.g.,* McConnell depo., vol. I at 119, 152–54; McConnell depo., vol. II at 62–6:3; McConnell Aff. ¶ 7.) At the very least, there are genuine issues of material fact as to Commonwealth's detrimental reliance that cannot be resolved via summary judgment.

The same result must be reached as to Enterprise. Enterprise based its credit decisions concerning continued shipments to AHS, including decisions to release product from credit hold and fix credit limits, at least in part, on McMahon's assurances that AHS was being purchased by Jecon. (Murch dep., vol. I at 48–49, 80–81; Murch dep., vol. II at 70–71.) Also, in August of 1993, Enterprise shipped product to AHS based both on the receipt of a $36,000 payment and on McMahon's representation that Jecon would be the new owner of AHS. (Murch dep., vol. I at 46, 84–85.) That there may have been other reasons for Enterprise's actions—e.g., AHS's "cash-flow problems" and Enterprise's prior experiences with McMahon—does not necessarily mean that McMahon's representations concerning the sale of AHS played no part. In sum, there is sufficient evidence for a reasonable jury to conclude that Plaintiffs, to their detriment, reasonably relied on McMahon's representations.

■ Finally, McMahon asserts that the Court cannot rely on the affidavits of McConnell, Price or Raskin in finding a genuine issue of material fact. This argument is misplaced. McMahon cites two state appellate cases for the proposition that "a party cannot create a disputed issue of fact by the expedient of contradicting by affidavit statements previously made under oath at a deposition." *Morrell v. Precise Eng'g, Inc.,* 36 Mass.App.Ct. 935, 630 N.E.2d 291, 294 (1994); *accord O'Brien v. Analog Devices, Inc.,* 34 Mass.App.Ct. 905, 606 N.E.2d 937, 939 (1993). A similar proposition is evidenced by decisions of this circuit. *See, e.g., Colantuoni v. Alfred Calcagni & Sons, Inc.,* 44 F.3d 1, 4–5 (1st Cir.1994) (citations omitted). Here, the affidavits of McConnell, Price and Raskin cannot be deemed to be improperly creating contradictions as they were made in August of 1995, well prior to the January and February, 1996, depositions they allegedly contradict.

b. McMahon's Representations

McMahon next contends that Plaintiffs are, in any event, unable to prove the falsity of his statements—that the purchaser of AHS, later identified as Jecon, would honor AHS's obligations. For example, McMahon points out that, just prior to the asset sale, Whitaker and he reviewed a list of accounts receivable in order to highlight the ones they understood would be paid by the new owners and that Commonwealth and Enterprise were both on that list. Moreover, McMahon asserts, post-sale activity indicates that the statements McMahon made were in fact true; thus, after the asset sale, Plaintiffs were both told by Golber that they would be paid in full for AHS debts.

Initially, it must be noted that, viewing the facts most favorably to Plaintiffs, it can be inferred that McMahon's representations were false—Jecon neither purchased AHS nor honored its obligations. To be sure, immediately following the asset sale, Amsign, through Golber, offered to pay Plaintiffs in full for AHS's debts. Indeed, other trade creditors were fully compensated. However, the promises made to Plaintiffs were conditioned on their acquiescence in more favorable credit terms, terms they were ultimately unwilling to accept.

In addition, there is other evidence which supports an inference that McMahon was making false statements in the summer of 1993. McMahon claims that he was told by Golber that AHS's trade suppliers would be paid and that he relayed this information to Plaintiffs. Golber, however, denied that he ever told McMahon that Plaintiffs would be paid or that Amsign ever agreed to such an

undertaking. McMahon is thus left only with his argument that he did not know that he was making false statements when he told Plaintiffs that AHS's debts would be paid by the new entity.

It is unnecessary to prove that a defendant charged with misrepresentation unequivocally knew that he was making a false statement. *See Nickerson v. Matco Tools Corp.*, 813 F.2d 529, 530 (1st Cir.1987). The real issue is whether accurate facts were available to the defendant but that he failed to exercise reasonable diligence necessary to learn them. *See Zimmerman*, 575 N.E.2d at 74. Moreover, it is well settled under Massachusetts law "that a party who discloses partial information that may be misleading has a duty to reveal all the material facts he knows to avoid deceiving the other party." *V.S.H. Realty, Inc. v. Texaco, Inc.*, 757 F.2d 411, 414 (1st Cir.1985). *Accord Adams v. Hyannis Harborview, Inc.*, 838 F.Supp. 676, 694 (D.Mass.1993), *aff'd on other grounds*, 73 F.3d 1164 (1st Cir.1996); *Barden v. Harpercollins Publishers, Inc.*, 863 F.Supp. 41, 43 (D.Mass.1994).

Here, in a letter from Golber dated August 5, 1993, McMahon was told: "If in fact Shawmut decides not to sell these assets directly to us, we will revert to purchasing the assets from both you and Ron Whitaker." Thus, viewing the facts most favorably to Plaintiffs, at least by early August, McMahon knew, or at least should have known, that AHS was not to be sold as an ongoing entity but only that its assets would be sold. In turn, a reasonable jury could determine that McMahon should have then inquired about the status of repayment to AHS's suppliers and altered the statements he had made, and continued to make, to Plaintiffs.[9] By not doing these things, there is certainly an appearance that McMahon was less than diligent.

At bottom, the Court will recommend that summary judgment not enter in McMahon's favor on the misrepresentation claims. The same result must be reached as to Jecon, although the question is closer.

### 2. Jecon

In seeking summary judgment on the misrepresentation claims, Jecon asserts that there is no evidence that it had any pertinent communications with Plaintiffs at a time or in a context in which it knew or should have known that Plaintiffs would rely in making shipment orders, forebearing from litigation or resuming shipment of product to AHS. Any representations made by McMahon, Jecon claims, are not chargeable to Jecon since McMahon was not Jecon's agent. In response, Plaintiffs allege that McMahon was Jecon's agent or at least that there is a genuine issue of material fact in this regard. In any event, Plaintiffs contend, others made misrepresentations on behalf of Jecon as well. Nonetheless, for the reasons stated below, the Court finds that Jecon is not entitled to summary judgment on the misrepresentation claims.

The Court makes two initial comments. First, Jecon cannot be charged, as a corporate entity, for failing to disclose information to Plaintiffs. Under Massachusetts law, there can be no actionable claim of fraud or misrepresentation for failing to disclose something absent a fiduciary or other special relationship which would impose a duty to disclose. *See Industrial Gen. Corp. v. Sequoia Pac. Sys. Corp.*, 44 F.3d 40, 44–46 (1st Cir.1995); *Milton v. Van Dorn Co.*, 961 F.2d 965, 968 n. 4 (1st Cir.1992); *Royal Business Group, Inc. v. Realist, Inc.*, 933 F.2d 1056, 1064 (1st Cir.1991). In this case, Jecon, as a corporate entity, did not have any direct communication with Plaintiffs during any relevant date. Nor is there any evidence of a fiduciary relationship that would impose upon Jecon the duty to disclose anything to Plaintiffs. *See Industrial Gen. Corp., supra.* As indicated below, however, Jecon is not off the hook given the alleged misrepresentations by Sayour and Markowitz.

---

9. Indeed, McMahon, "on or about August 11th," informed Commonwealth "that the deal with Jecon was to be signed and in place shortly or within a couple of weeks," (McConnell dep., vol. I at 77–78), and, "in the summer of 1993," conceivably after the August 5th letter was received, made other alleged misrepresentations to Plaintiffs, (*see, e.g.*, Williamson Aff. (Docket No. 23) ¶ 4; Murch dep., vol. II at 104–05).

Second, the Court rejects the sole argument Jecon's present counsel makes in its latest memorandum of law in support of its motion to dismiss the misrepresentation counts. (Docket No. 103.) Citing portions of the statute of frauds, namely M.G.L. ch. 259, §§ 1 and 4, Jecon now claims that the misrepresentation claims must be dismissed because there is no written memorandum evidencing Jecon's willingness to guarantee AHS's debts.[10]

Jecon appears to be confusing the misrepresentation claims with the breach of guaranty claims which have been voluntarily dismissed from the case. Had Plaintiffs asserted only breaches of oral guaranties, the statute of frauds might be a potent defense. The Massachusetts statute of frauds does not, however, bar enforcement of oral promises inasmuch as there is detrimental reliance. *Frederick v. ConAgra, Inc.,* 713 F.Supp. 41, 45 (D.Mass.1989). *See also Evans v. Certified Eng'g & Testing Co.,* 834 F.Supp. 488 (D.Mass.1993); *Hoffman v. Optima Sys., Inc.,* 683 F.Supp., 865, 869 (D.Mass.1988).

Here, Plaintiffs' allegations of misrepresentation go beyond mere claims that Jecon made oral guaranties concerning AHS's debts. The allegations concern oral misrepresentations upon which Plaintiffs detrimentally relied. *See, e.g., infra* at V(C)(2)(b); *see also supra* at V(C)(1). Indeed, Jecon's original counsel, in the first motion for summary judgment—perhaps recognizing the inapplicability of M.G.L. ch. 259, §§ 1 and 4—asserted the statute of frauds as a defense only to the breach of guaranty claims.

The Court now turns to the more fundamental questions at issue.

a. McMahon's Purported Authority

The first issue is whether McMahon's representations can somehow be attributed to Jecon, i.e., whether McMahon, as an agent of Jecon, had authority to bind Jecon. To prove that a corporation can be bound by an alleged misrepresentation by an agent, a plaintiff must first demonstrate that a principal-agent relationship existed. *See Patterson v. Barnes,* 317 Mass. 721, 60 N.E.2d 82 (1945). The essence of the principal-agent relationship is the right of power or control by the alleged principal over the conduct of the alleged agent. The relationship thus " 'results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control.' " *Kirkpatrick v. Boston Mut. Life Ins. Co.,* 393 Mass. 640, 473 N.E.2d 173, 176 (1985) (*quoting* Restatement (Second) of Agency § 1 (1958)). *See also Sabel v. Mead Johnson & Co.,* 737 F.Supp. 135, 138 (D.Mass.1990) (citing cases); *American Home Assur. Co.,* 808 F.Supp. at 72. The question, at bottom, is one of authority.

As the parties agree, a principal's authority over an alleged agent can be shown in two ways. Actual authority arises from a manifestation of consent by the principal that another may act as his agent. *See, e.g., Sanford v. Orient Ins. Co.,* 174 Mass. 416, 54 N.E. 883 (1899); *Rubel v. Hayden, Harding & Buchanan, Inc.,* 15 Mass.App.Ct. 252, 444 N.E.2d 1306, 1308 (1983). Apparent authority, on the other hand, requires proof of conduct "by the principal which causes a third person reasonably to believe that a particular person has authority to enter into negotiations or to make representations as its agent." *DeVaux v. American Home Assur. Co.,* 387 Mass. 814, 444 N.E.2d 355, 358 (1983) (citations and internal quotation marks omitted). *See Greenstein v. Flatley,* 19 Mass.App.Ct. 351, 474 N.E.2d 1130, 1133 (1985). In either instance, there must be some direct intervention by the principal. *See* Restatement (Second) of Agency § 26 (generally, "authority to do an act can be

---

**10.** M.G.L. ch. 259, § 1, states, in pertinent part, that "[n]o action shall be brought. .[t]o charge a person upon a special promise to answer for the debt, default or misdoings of another ... [unless the promise ... upon which such action is brought ... is in writing and signed by the party to be charged therewith or by some person thereunto by him lawfully authorized." Similarly, M.G.L. ch. 259, § 4, provides that "[n]o action shall be brought to charge a person upon or by reason of a representation or assurance made concerning the character, conduct, credit, ability, trade or dealings of any other person, unless such representation or assurance is made in writing and signed by the party to be charged thereby, or by some person thereunder by him lawfully authorized."

created by written or spoken words or other conduct *of the principal*") (emphasis added).

■ Here, there is no evidence that Jecon ever appointed or conferred actual authority on McMahon to act as its agent. Similarly, there is no evidence that Jecon communicated anything to Plaintiffs that would have led a reasonable person to believe that it consented to have anything done on its behalf by McMahon. There is thus no apparent authority. Finally, to the extent that Markowitz or Sayour, purportedly on behalf of Jecon, communicated with Plaintiffs, *see infra*, there is no evidence that such communications had anything to do with the avowed authority of McMahon.

Granted, there may be genuine and material issues as to whether McMahon had authority to act on behalf of *Amsign*. Indeed, it is at this question that Plaintiffs lob the bulk of their argumentative arsenal. (*See*, *e.g.*, Pls.' Consolidated Mem. in Opp'n to Motion for Summ. J. (Docket No. 31) at 12–15; Pls.' Supp. Mem. in Opp'n to Motion for Summ. J. (Docket No. 84) at 28–29.) As indicated, however, the action against Amsign has been stayed since its suggestion of bankruptcy. With respect to *Jecon*, on the other hand, there is simply no evidence sufficient to demonstrate that McMahon had any authority to act on its behalf.

### b. Other Misrepresentations

The second issue is whether persons other than McMahon, e.g., Sayour and Markowitz, made misrepresentations that can sufficiently be attributed to Jecon so as to make summary judgment inappropriate. On this issue, Plaintiffs fare better.

Prior to September 13, 1993, Sayour—who was at the time a Jecon employee—allegedly contacted Peter Gude ("Gude") of Commonwealth and convinced Gude that Commonwealth should continue to do business with AHS and release various credit holds. Sayour assertedly told Gude that members of the Katz family would be purchasing AHS and that the company would continue to do business under new ownership which would be backed by the financial strength of Jecon. Gude avers that, in substance, Sayour told

him that Commonwealth would not be harmed by the transfer of ownership and would be in a better condition given the financial strength of the new management.

Additionally, Plaintiffs claim that prior to September 13, 1993, Sayour placed orders on behalf of AHS while he was an officer and employee of Jecon. Moreover, in July of 1993, Sayour allegedly called Gude, as a Jecon employee, for the purpose of establishing a meeting between Commonwealth and the new owners of AHS. Indeed, at a meeting in October of 1993 at Jecon's offices, Williamson, another Commonwealth employee, was purportedly told that Jecon would be involved in the AHS deal through Katz–Golber. Finally, Plaintiffs contend that Markowitz, on at least one occasion, made oral representations that Jecon would pay for a shipment of product to AHS.

Unlike McMahon, it is possible, if not likely, that Sayour and Markowitz had authority to act on Jecon's behalf. At the time the alleged misrepresentations were made, Sayour was both a Jecon officer and employee and Markowitz was Jecon's president. Nowhere does Jecon challenge this possibility.

■ Nevertheless, Jecon did argue, in its original motion for summary judgment, that there was no evidence that Plaintiffs detrimentally relied upon Sayour's alleged misrepresentations.[11] The ensuing discovery, however, demonstrates that there are genuine issues of material fact regarding Plaintiffs' detrimental reliance that cannot be resolved via summary judgment. As the previous discussion regarding McMahon indicates, a reasonable jury could infer that Plaintiffs detrimentally relied on a number of misrepresentations. *See, e.g. supra* at V(C)(1)(a). A reasonable jury could also infer that some of those misrepresentations were made by persons other than McMahon. *See id.; see also* Pls.' Supp. Statement of Mat. Facts in Dispute (Docket No. 85) ¶¶ 49 ("[o]ne of the reasons Commonwealth ... released product from credit hold in July of 1993, was the proposed new ownership of AHS"), 52 ("[o]n or about July 28, 1993, [Commonwealth] approved the release of all

11. Jecon's present counsel does not press this theory at all.

pending AHS orders and the acceptance of new orders based on the facts that the new owners appear[ed] to be sincere in their intentions and had scheduled meetings with Commonwealth personnel"), 56 (Enterprise made decisions concerning AHS "based on statements and assurances on what was to happen to the company"). This inference is bolstered by the statements that Sayour and Markowitz allegedly made.

■ Finally, Jecon—recognizing perhaps the futility of such an argument at this time—does not presently contest the possibility that Sayour's statements could have been knowingly false. Sayour's representations concerning the sale of AHS were apparently made in late July of 1993. During that time, however, Golber and Katz–Golber were contemplating a deal with Shawmut. A question of fact therefore exists, for virtually the same reasons discussed above with respect to McMahon, as to whether Sayour's statements were false when made or became false thereafter, at which point Sayour had a duty to correct. *See supra* at V(C)(1)(b).

To sum up, neither McMahon nor Jecon are entitled to summary judgment on Count VII of the original complaint and Count V of the amended complaint. The question is closer with regard to Jecon, particularly since McMahon's alleged misrepresentations cannot be attributed to it. Nonetheless, given the questions concerning Sayour and Markowitz, this Court is unwilling, at this stage of the proceedings, to suggest excusing Jecon from liability on these counts.

### D. Estoppel

In Count VII[sic] of the original complaint, Plaintiffs assert that Jecon caused Plaintiffs to detrimentally rely upon Jecon's representations and, as a result, should be "estopped from denying liability." The same assertion is made in Count VI of the amended complaint.

It first appeared as if Plaintiffs' estoppel argument was directed at the breach of guaranty claim—Count V of the original complaint—which is no longer a part of this case. (*See* Pls.' Aug. 7, 1995, Mem. (Docket No. 31) at 9.) Presently, however, both Plaintiffs and Jecon address the estoppel counts in conjunction with the misrepresentation claims. (*See* Docket Nos. 11 at 11–12, 84 at 31–32, 103 at 4–6 and 109 at 2–3.) The Court does likewise.

■ To establish a claim of estoppel, a plaintiff must show (1) a representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation was made, (2) an act or omission resulting from the representation by the person to whom the representation was made, and (3) detriment to the person as a consequence of the act. *Industrial Bankers of Mass. v. Reid, Murdoch & Co.*, 297 Mass. 119, 8 N.E.2d 19, 22 (1937); *accord Frederick*, 713 F.Supp. at 45. *See also DeSisto's Case*, 351 Mass. 348, 220 N.E.2d 923, 925 (1966). The parties both agree to this standard.

■ Jecon asserts, however, that since, in its view, it is not liable for any misrepresentations, Plaintiffs are perforce unable to recover under an estoppel theory. Unfortunately for Jecon, the Court has found genuine and material issues, given both Markowitz and Sayour's representations, to allow the misrepresentation claims to survive summary judgment. The Court therefore finds, at least as to Jecon, that the estoppel claims should also continue to trial.

■ This finding is not altered by Jecon's most recent argument—that the estoppel counts must be dismissed because of the statute of frauds. "Massachusetts law recognizes that actions taken in reliance upon a material representation may estop a party from raising a statute of frauds defense." *Evans*, 834 F.Supp. at 496 (citing cases). In the case at bar, Plaintiffs' allegations of estoppel, as with the misrepresentation counts, go beyond mere claims that Jecon made oral guaranties concerning AHS's debts. Accordingly, the Court will recommend that Jecon not be granted summary judgment on Count VII[sic] of the original complaint and Count VI of the amended complaint.

### E. Chapter 93A

Finally, Plaintiffs assert in Count X of the original complaint that McMahon and Jecon's actions constitute unfair methods of competi-

tion and unfair and deceptive acts or practices in the conduct of trade or commerce in violation of Chapter 93A of the General Laws of Massachusetts. *See* M.G.L. ch. 93A, §§ 2(a) and 11. The same assertion is made in Count VII of the amended complaint.

■ Because litigation under Chapter 93A is "rampant," the courts have developed a rigorous test for assessing such claims. *Quaker State Oil Ref. Corp. v. Garrity Oil Co.*, 884 F.2d 1510, 1513 (1st Cir.1989). "The objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Id.* (citations and internal quotation marks omitted). Stated another way, a Chapter 93A plaintiff "must show that the defendant's actions fell 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness,' or were 'immoral, unethical, oppressive or unscrupulous,' and resulted in 'substantial injury ... to competitors or other businessmen.' " *Id.* (*quoting PMP Assoc., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 321 N.E.2d 915, 917 (1975)).

■ In this case, it seems highly unlikely that the alleged conduct of Jecon and McMahon rises to the level of "rascality" necessary for Plaintiffs to recover under Chapter 93A. Thus, the Court is of the opinion that Plaintiffs have a tough row to hoe if they hope to prove Chapter 93A liability. Nonetheless, because the question of " 'whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact,' " *Ahern v. Scholz*, 85 F.3d 774, 797 (1st Cir.1996) (*quoting Schwanbeck v. Federal–Mogul Corp.*, 31 Mass.App.Ct. 390, 578 N.E.2d 789, 803 (1991), *rev'd on*

other grounds, 412 Mass. 703, 592 N.E.2d 1289 (1992)), and since the Court has found enough issues to allow the misrepresentation claims, among others, to survive, the Court will also recommend that summary judgment not be granted on Count X of the original complaint or Count VII of the amended complaint.

## VI. *CONCLUSION*

For the foregoing reasons, this Court recommends that Jecon be GRANTED summary judgment on Counts I–IV and IX of the amended complaint. In all other respects, the Court recommends that the motions made in Docket Nos. 11 and 72, as supplemented by Docket No. 103, be DENIED, insofar as they relate to Jecon. Finally, the Court recommends that McMahon's motion for summary judgment (Docket No. 92) be DENIED.[12]

---

12. The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within ten (10) days** of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of

Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services*, 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete*, 792 F.2d 4, 6 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir.1980); *United States v. Vega*, 678 F.2d 376, 378–79 (1st Cir.1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir.1983). *See also Thomas v. Arn*, 474 U.S. 140, 154–55, 106 S.Ct. 466, 474–75, 88 L.Ed.2d 435 (1985). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.