QUAKER STATE OIL REFINING COR-
PORATION, Plaintiff, Appellee,

v.

GARRITY OIL COMPANY, INC.,
Defendant, Appellant.

QUAKER STATE OIL REFINING
CORPORATION, Plaintiff,
Appellant,

v.

GARRITY OIL COMPANY, INC.,
Defendant, Appellee.

Nos. 89–1258, 89–1296.

United States Court of Appeals,
First Circuit.

Heard Aug. 4, 1989.

Decided Sept. 14, 1989.

Robert G. Levy, with whom Berryl A. Speert, Frank, Bernstein, Conaway & Goldman, Brian W. LeClair, Ann Johnston, and Fordham & Starrett, Boston, Mass., were on brief for Garrity Oil Co., Inc.

Donald B. Gould, with whom Hilary S. Schultz, Robert M. Duffy, and Goodwin, Procter & Hoar, Boston, Mass., were on brief for Quaker State Oil Refining Corp.

Before BOWNES, TORRUELLA and SELYA, Circuit Judges.

SELYA, Circuit Judge.

Invoking diversity jurisdiction, 28 U.S.C. § 1332(a), Quaker State Oil Refining Corporation (QSOR) sued a former distributor, defendant Garrity Oil Company (Garrity), in the United States District Court for the District of Massachusetts. Disenfranchised and disaffected, Garrity countersued. The district court ended the hostilities short of trial and the belligerents both appeal. We affirm.

## I. BACKGROUND

Certain basic facts brook no disagreement. For several years, Garrity was an authorized nonexclusive distributor for plaintiff. In 1984, its sales of QSOR's products began to decline. Eventually, a QSOR executive, Monterosso, sent word that a second distributor might be appointed in Essex County, Massachusetts (a part of Garrity's territory). Defendant requested and received a six-month reprieve. But,

the business drain was not stanched. In July 1985, QSOR named Quality Lubricants (Quality) as an additional distributor.

Garrity was upset no little and quite some—particularly since Quality's principals, William Coletti and Francis Mills, were Garrity's ex-employees. Only the previous month, Garrity had filed a state court suit against Coletti and Mills, alleging unfair competition and worse.[1] Thereafter, the tension mounted as Garrity's sales continued to decline—a drop which the firm attributed not only to Quality's improper activities, but to the complicity therein of Michael Sugrue, a QSOR employee. Garrity continued to order products and handle the line, but began ignoring plaintiff's billings and no longer honored a half-dozen promissory notes evidencing loans made by QSOR to defendant during happier times.

Cutting off the flow of cash in this fashion produced a fairly predictable result: in 1986, QSOR sued Garrity to recover the balances due on a variety of unpaid invoices (count 1) and promissory notes (count 2). The complaint was subsequently amended to allege unfair trade practices violative of Mass.Gen.L. ch. 93A (count 3). Garrity responded with counterclaims positing unfair competition, breach of contract, and interference with both contractual and prospective business relations.[2] More than thirty months of skirmishing ensued, requiring over one hundred entries on the district court docket.

We see no purpose in retracing the parties' steps in exquisite detail. The denouement occurred when QSOR's motion for summary judgment on all claims and counterclaims was heard and decided. At that time, the district court determined the entire controversy: it granted summary judgment in QSOR's favor on counts 1 and 2 (the invoice and promissory note claims), *QSOR v. Garrity*, No. 86–1446–T, slip op.

at 4–5 (D.Mass. Jan. 30, 1989) (D.Ct.Op.), and on the four counterclaims, *id.* at 6–13. The court denied the motion as to count 3, instead entering judgment in defendant's favor, *sua sponte*, on that claim. *Id.* at 5–6. In a separate order entered the same day, the court refused to allow defendant to add a fifth counterclaim. Plaintiff then successfully sought prejudgment interest, the district court obliging on the authority of Mass.Gen.L. ch. 231, § 6C (1985).

On these appeals, not every determination of the district court is challenged. QSOR finds fault only with the abrupt termination of its chapter 93A claim. Garrity assigns error to (1) use of Massachusetts' prejudgment interest rule, (2) interdiction of the four counterclaims, and (3) denial of leave to add the proposed fifth counterclaim. We limit our inquiry to these specifications.

## II. SUMMARY JUDGMENT STANDARD

The yardstick by which allowance of summary judgment must be measured is not in doubt. Summary judgment is warranted only if:

> [T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Though the movant's task is daunting, the nonmovant has a threshold burden to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A "genuine" dispute requires more than suspicion or bluster. "The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve

---

1. In that action, Garrity claimed that Coletti and Mills acted unscrupulously in a multitude of ways, *e.g.,* employing a trade name ("Sure Oil") deceptively similar to the trade name ("Shore Sales") utilized by Garrity in Essex County and environs; pilfering and using without authoriza-

tion the Shore Sales customer list; and disparaging Garrity in the marketplace.

2. Technically, defendant pled one counterclaim containing four counts. For ease in reference, we treat the assertions as comprising four separate counterclaims.

at an ensuing trial." *Mack v. Great Atlantic & Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989). The disagreement must also be material: "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original); *see also Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976).

■ Because the grant of summary judgment calls into play a legal standard—saying, in effect, "there is no fact-specific controversy which must be resolved in order to decide this case"—appellate review is plenary. We can affirm the judgment below "only if we are fully satisfied that there is no genuine dispute as to any relevant fact issue and that the [prevailing party] is, as a matter of law, due the relief which the district court awarded." *Advance Financial Corp. v. Isla Rica Sales, Inc.*, 747 F.2d 21, 26 (1st Cir.1984). In conducting this tamisage, we must grant the benefit of any genuinely disputed datum, and all reasonable inferences plausibly extractable from properly documented facts of record, to the nonmovant. *Mack*, 871 F.2d at 181; *Greenberg v. Puerto Rico Maritime Shipping Auth.*, 835 F.2d 932, 934 (1st Cir.1987).

Mindful of this astrictive standard, we examine the parties' appeals.

## III. QUAKER STATE'S APPEAL

Count 3 contended that Garrity's withholding of the sums admittedly due on the trade debt and promissory notes, coupled with its prosecution of the counterclaims, was a form of "extortion" sufficient to warrant chapter 93A liability. The district court disagreed. QSOR does not contest the court's power to grant summary judgment *sua sponte*, nor could it do so. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1985); *Jardines Bacata, Ltd. v. Diaz–Marquez*, 878 F.2d 1555, 1560–61 (1st Cir.1989). The only bona fide issue is whether that power

was exercised properly according to the rigorous protocol of Rule 56. *See Donate–Romero v. Colorado*, 856 F.2d 384, 386 (1st Cir.1988).

■ Litigation under Mass.Gen.L. ch. 93A is rampant, but a common refrain has developed. "The objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Levings v. Forbes & Wallace, Inc.*, 8 Mass.App.Ct. 498, 396 N.E.2d 149, 153 (1979); *see also Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 515–16 (1st Cir.1988) (unscrupulous or unethical conduct usually required); *Williams v. Arndt*, 626 F.Supp. 571, 581–82 (D.Mass.1985) (similar). In other words, a chapter 93A claimant must show that the defendant's actions fell "within at least the penumbra of some common-law, statutory, or other established concept of unfairness," or were "immoral, unethical, oppressive or unscrupulous," and resulted in "substantial injury ... to competitors or other businessmen." *PMP Associates, Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 321 N.E.2d 915, 917 (1975); *accord Pepsi–Cola Metro. Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 17–18 (1st Cir. 1985); *Levings*, 396 N.E.2d at 153.

■ When a party moves for summary judgment and the court, *sua sponte*, grants judgment the other way, the usual approach to appellate oversight of Rule 56 orders must be inverted. On count 3, therefore, we view the record in the light most flattering to QSOR (the summary judgment loser). So viewed, we do not think that Garrity's conduct—withholding funds and countersuing—was intolerable or sank to the depths of miscreancy required for liability under the statute. No one seriously disputes that Garrity had been damaged or that it had a reasonable basis for suing Coletti and Mills. Given the full panoply of circumstances, it was not preposterous to think that QSOR might be part of the problem. Though Garrity erred in evaluating the strength and prospects of its case, there was a basis for founded suspicion. The mere fact that defendant did not prevail on its counterclaims

is no signal that the counterclaims were groundless. Moreover, even if rooted more in hope than reason, there is no indication that Garrity's actions were motivated by any pernicious purpose collateral to winning the suit and ensuring payment of damages sustained. There was no documented attempt at wrongful exaction of something apart from defendant's due, ergo, no "extortion" (or anything sufficiently resembling it). As the court below stated, "a wrongful set-off, without more, cannot violate ch. 93A." D.Ct.Op. at 6. And as we explain below, there was no "more."

First, there has been no satisfactory showing that nonpayment was aimed at pressuring QSOR into doing something "in the conduct of any [ongoing] trade or commerce." Mass.Gen.L. ch. 93A, § 2 (1984); *see Stromberg v. Costello,* 456 F.Supp. 848, 850–51 (D.Mass.1978). Second, although the cases which dot the chapter 93A landscape tend to be fact-specific, even *sui generis,* we think they are generally supportive of the proposition that a setoff which proved unwarranted could not, in and of itself, be classified as abridging some established concept of mercantile fairness. *Compare, e.g., Stromberg,* 456 F.Supp. at 851 (pressure or coercive threat, causally linking use of legal remedy to course of business dealings, required for chapter 93A violation) (dicta); *Datacomm Interface, Inc. v. Computerworld, Inc.,* 396 Mass. 760, 489 N.E.2d 185, 195 (1986) (groundlessness of claim is not an element of abuse of process); *Whitinsville Plaza, Inc. v. Kotseas,* 378 Mass. 85, 390 N.E.2d 243, 251 (1979) (breach of contract, standing alone, does not constitute a chapter 93A violation); *Cohen v. Hurley,* 20 Mass.App. 439, 480 N.E.2d 658, 660 (1985) (no abuse of process where claim frivolous if brought only to defeat opponent in court); *see also Broadway Management Services, Ltd. v. Cullinet Software, Inc.,* 652 F.Supp. 1501, 1504 (D.Mass.1987) (litigating with concurrent intent to burden defendant with cost is not abuse of process without collateral motive or design to coerce); *Jones v. Brockton Public Markets, Inc.,* 369 Mass. 387, 340 N.E.2d 484, 485 (1975) (no cause of action absent use of process for ulterior or illegitimate purpose); *cf. Pepsi–Cola,* 754 F.2d at 18 (withholding of monies legally owed to achieve some extortionate goal transgresses chapter 93A).

Whether or not the counterclaims now appear futile, Garrity had the right to test them through litigation. It had a correlative right to assert its theory of setoff. QSOR does not contend before us that withholding of the funds was accomplished with a coercive design directed to "the conduct of any [ongoing] trade or commerce." Mass.Gen.L. ch. 93A, § 2. Under the circumstances, summary judgment was appropriate on the chapter 93A claim.

## IV. GARRITY'S APPEAL

We turn now to Garrity's three-pronged appeal, dealing separately with each furculum.

### A. *Prejudgment Interest.*

■ We believe that the district court's decision to apply Massachusetts' prejudgment interest statute (rather than Pennsylvania law, as defendant wanted) was correct.[3] Sitting in diversity jurisdiction, the judge was bound to look initially to the forum's choice-of-law principles, that is, to apply the law which a state court in Massachusetts would apply. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Union Mut. Life Ins. Co. v. Chrysler Corp.,* 793 F.2d 1, 16 (1st Cir.1986); *Advance Financial,* 747 F.2d at 28. In the Commonwealth, a decision about which law to apply vis-a-vis prejudgment interest presents a substantive, not a procedural, question; thus, Massachusetts would not automatically invoke its own statute. *See Morris v. Watsco, Inc.,* 385 Mass. 672, 433

---

**3.** The dollar difference is substantial. The applicable Massachusetts rate is 12%. Mass.Gen. Law ch. 231, § 6C (1985). In Pennsylvania, the prejudgment interest rate in suits to recover contract damages appears to be 6%. *See* 41 Pa.Stat. § 202 (1974); *Petersen v. Crown Financial Corp.,* 661 F.2d 287, 292 (3d Cir.1981) (applying Pennsylvania law); *Daset Mining Corp. v. Indus. Fuels Corp.,* 326 Pa.Super. 14, 473 A.2d 584, 594–95 (1984).

N.E.2d 886, 889–90 (1982); Restatement (Second) of Conflict of Laws § 187(1) (1971).

Here, the parties did not choose in advance which body of law would apply; the invoices and notes were noncommittal on the subject. In the absence of predesignation, choice of law was governed by the tenets elucidated in *Travenol Laboratories, Inc. v. Zotal, Ltd.*, 394 Mass. 95, 474 N.E.2d 1070 (1985). *Travenol* involved nonpayment of invoices silent as to controlling law. The Supreme Judicial Court decided that Massachusetts law applied, relying on the Restatement view that courts should apply the "law of the state where under the terms of the contract the seller is to deliver the chattel unless, with respect to the particular issue, some other state has a more significant relationship" in light of general choice-of-law considerations. *Id.* 474 N.E. at 1073 (citing Restatement). In this case, notwithstanding Garrity's claim that the goods were shipped "F.O.B. Oil City, Pennsylvania"—a claim disputed by QSOR—the district court resorted to Massachusetts law, apparently determining that Massachusetts had a more significant relationship to the matters in question.

This court reviews choice-of-law assessments *de novo*. *Kukias v. Chandris Lines, Inc.*, 839 F.2d 860, 861 (1st Cir.1988); *Diamond International Corp. v. Allstate Ins. Co.*, 712 F.2d 1498, 1500–02 (1st Cir. 1983). Taking a fresh look, as we must, it seems plain that Massachusetts has the highest relative interest in the controversy and in the issue of prejudgment interest. Garrity is a Massachusetts corporation. Its principal place of business is there, as are substantially all its assets and most of its operations. The goods wound up in Massachusetts and were, by and large, resold there. The invoices were sent to Garrity in the Commonwealth. The loans evidenced by the promissory notes were made so that Garrity could establish, maintain, and/or expand its business interests (which, in turn, were centered in Massachusetts). The conduct which assertedly gave rise to Garrity's right of setoff occurred in Massachusetts. And, defendant had no substantial contacts with Pennsylvania.

Clearly, then, the forum state was also the center of gravity of the trade debt and loan matters. Because no other state had an equally significant relationship to the transactions in question, it was appropriate to apply Massachusetts' prejudgment interest rule. *See Travenol*, 474 N.E.2d at 1073; *see also* Restatement (Second) of the Conflict of Laws §§ 6, 191 (1971); *Roy v. Star Chopper Co.*, 584 F.2d 1124, 1135 (1st Cir.1978) (a district court sitting in diversity jurisdiction should ordinarily apply forum state's prejudgment interest rule).

Garrity's arguments in favor of Pennsylvania are unpersuasive. Principally, Garrity points to the distributorship agreements between it and QSOR, all of which recite that they are to be governed by Pennsylvania law. The problem with this argument is that the claims contained in counts 1 and 2, and reduced to judgment, were not based on covenants in the distributorship agreements but on separate, distinct instruments: invoices and promissory notes. The distributorship agreements do not specify the terms of any particular purchases, sales, deliveries, or loans between the parties, nor do they embody Garrity's obligations anent any of the claims *sub judice*. Had the parties intended the choice-of-law stipulation to have effect beyond the contours of the distributorship contracts, they would doubtless have so provided. They did not do so—and we have no warrant to rewrite their arrangement. *See RCI Northeast Services Div. v. Boston Edison Co.*, 822 F.2d 199, 204–05 (1st Cir.1987) (unbefitting for courts to accomplish by judicial fiat what sophisticated contracting parties chose to eschew); *New England Structures, Inc. v. Loranger*, 354 Mass. 62, 234 N.E.2d 888, 893 (1968) (inappropriate for court to imply contract provision when parties would naturally have been expected to include it, had that been their intention).

### B. *The Counterclaims.*

We need not linger long over Garrity's original quadrat of counterclaims. Although four separate theories were pled, *see supra* at 3, the counterclaims sounded

a common theme: that QSOR participated in, and was guilty of, some actionable misconduct toward defendant. Because Garrity would have borne the devoir of persuasion at a trial of the counterclaims, the jurisprudence of Rule 56 teaches that it was Garrity's obligation in opposing QSOR's motion to show affirmatively the existence of some genuine and material factual controversy on the causes of action asserted therein. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Paterson–Leitch Co. v. Massachusetts Municipal Wholesale Elec. Co.*, 840 F.2d 985, 992 (1st Cir.1988). Despite ample opportunity for wide-ranging discovery, defendant defaulted on this obligation.

■ Garrity offers five specific instances in which QSOR supposedly ran afoul of legal obligations. These claims fall into three discrete groupings. Certain of them —*e.g.*, that Monterosso knew of Coletti's plan to use the name "Sure Oil" and did not advise Garrity; that Garrity told QSOR that Coletti and Mills were competing unfairly, but QSOR did nothing—are legally irrelevant. Plaintiff had no duty to take sides in a dispute between two distribution companies vying for custom, or to pass judgment upon the distributors' respective ethics (or lack thereof), or to act as a guardian of someone else's corporate morals. The second set of claims—*e.g.*, that QSOR unfairly characterized Garrity's performance during the six-month "probationary" period—concerns matters that are both irrelevant and unsupported. From the start, Garrity's relationship with QSOR was nonexclusive; plaintiff had an absolute right to appoint other distributors within the territory. That it gave Garrity a grace period at all was an act of largesse. And in any event, the record reflects no actionable unfairness on QSOR's part during the six-month hiatus.

The last grouping comprises claims which, unlike the first two, involve material facts—but the nisi prius roll does not reveal *genuine* disputes as to them. Garrity asserts that QSOR, particularly through Sugrue, actively assisted Coletti and Mills in efforts to steal customers and to per-

form other nefarious tricks. On this record, the assertion seems all cry and no wool. While there was admittedly evidence of cozenage on the part of the ex-employees, there was simply no factual demonstration adequate to bear out the accusation that QSOR was in league with them in an improper way.

To be sure, Garrity pinpoints a series of telephone calls made between certain persons, and certain telephones, some involving telephone numbers assigned to firms named in Shore Sales' confidential customer list. The proof was sufficient to infer that calls took place and perhaps to infer the identity of the speakers—but the calls' contents are unknown. Garrity nowhere showed any tortious action on the part of QSOR personnel during these calls or proved in any way that the calls unlawfully contributed to its loss of custom. A vital link in the chain of proof was missing.

Put in more generic terms, defendant at most demonstrated the presence of smoke, not fire. Nor could inference, in this instance, supply the spark. Though never certain, inference can sometimes be plain enough to justify a finding of fact. But, creditable inferences must rest on solid, fact-specific footings. When, as here, inference pyramids upon itself, it becomes too conjectural to be accorded probative value. And because inference piled upon inference was incapable of bridging the chasmal gap in defendant's case, all that remained were the very sort of "unsupported allegations and speculations" that we have consistently held inadequate to block summary judgment. *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir.1988); *see also Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. Too much was left to the imagination.

We need go no further. We have painstakingly scoured the mountain of papers assembled during protracted pretrial discovery. Having endured this exercise, we find the district court's careful summary of the disputed facts, and of the shortfall in defendant's proffer, D.Ct.Op. at 6–13, to be valid—so much so that it would be pleonastic for us to cover the same terrain. We

therefore limit our contribution to what we have already written and affirm the entry of summary judgment on the four counterclaims for substantially the reasons stated in the opinion below.

### C. *Leave to Amend.*

The last issue presented for our perscrutation involves the district court's refusal to permit Garrity to serve a fifth counterclaim out of time. The rudiments are these. Suit was commenced in the district court on May 9, 1986. On June 27, Garrity's counterclaims were filed. Almost two years went by before Garrity, on May 5, 1988, moved to add the fifth counterclaim.[4] By that time, virtually all discovery had been undertaken or at least noticed. A magistrate allowed the amendment and QSOR immediately moved for district court reconsideration. The court's order, entered January 30, 1989, stated simply: "Plaintiff's motion for reconsideration of the Magistrate's ruling of September 9, 1988, allowing an amendment to the counterclaim, is hereby allowed. The Magistrate's ruling is hereby vacated." Although a magistrate's ruling on a nondispositive pretrial matter may be reconsidered and reversed by the district judge only if clearly erroneous or contrary to law, 28 U.S.C. § 636(b)(1)(A) (1982), we believe the district court acted appropriately in this instance.[5] We explain briefly.

The proposed counterclaim sounded in quantum meruit. We quote its central averments *in extenso:*

> Since at least as early as the fall of 1985 and continuing to the present time, Quaker State has used Garrity Oil's equipment, without Garrity Oil's permission, to service its large national account customers. Quaker State distributor ... Quality Lubricants, with Quaker State's acquiescence, has delivered and continues to deliver in behalf of Quaker State, large quantities of Quaker State products into tanks and pumps owned by Garrity Oil and located on the premises of large Quaker State customers.... Other Quaker State distributors ... have also delivered and continue to deliver, with Quaker State's authorization, Quaker State products into Garrity Oil's equipment....

Record Appendix at 65–66. The counterclaim, then, was only peripherally related to other matters at issue and was permissive rather than compulsory. *See* Fed.R. Civ.P. 13(b).

█ While leave to amend "shall be freely given when justice so requires," Fed. R.Civ.P. 15(a), parties seeking the benefit of the rule's liberality have an obligation to exercise due diligence; unseemly delay, in combination with other factors, may warrant denial of a suggested amendment. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Imperial Enterprises, Inc. v. Fireman's Fund Ins. Co.,* 535 F.2d 287, 293 (5th Cir.1976). A party's belated attempt to revise its pleadings requires that a court examine the totality of the circumstances and exercise sound discretion in light of the pertinent balance of equitable considerations. *See, e.g., T.J. Stevenson & Co. v. 81,193 Bags of Flour,* 629 F.2d 338, 370–71 (5th Cir.1980) (discussing omitted counterclaim).

█ Here, the relevant indicators point uniformly toward disallowance. Garrity's tardiness was extreme. The facts upon which the proposed counterclaim rested

---

**4.** Garrity suggests that it put QSOR on notice of the underlying claim in the joint pretrial memorandum filed on November 2, 1987. That may be so. But, the fact remains that plaintiff had no reason to take Garrity's comments as anything more than mere badinage unless and until a motion to amend was actually filed. That did not take place until May 5, 1988.

**5.** The magistrate's order was cryptic. She made no findings and offered no hint as to her reasons for believing the late amendment to be justified. Under such circumstances, the order

was divested of its usual force, and the district judge was entitled to discount it to some degree. *Cf. Spiegel v. Trustees of Tufts College,* 843 F.2d 38, 43–44 (1st Cir.1988) (occasion for appellate deference to district court's Rule 54(b) certification disappears when court has neither made specific findings nor outlined its reasoning); *Webb v. Califano,* 468 F.Supp. 825, 829 (E.D.Cal. 1979) (suggesting that magistrate's findings indicate "depth" of work and may vary extent of judge's review).

were known to defendant all along. Only two months remained in an already extended discovery period, and plaintiff was obliged to move for summary judgment within three weeks, or waive the chance. A great deal of discovery had taken place without reference to the neoteric theory, thus prejudicing QSOR. Most important, defendant never proffered a satisfactory explanation for its delay. In our estimation, there was ample reason to bar the late-emerging counterclaim. *Cf. Hayes v. New England Millwork Distributors, Inc.,* 602 F.2d 15, 19–20 (1st Cir.1979) (two-year delay sufficient to support denial of amendment where movant has not carried burden of explaining delay). And, because the relevant factors tipped the scales so heavily, the district court was within its proper domain in deciding that a mistake had been made by the magistrate.

## V. CONCLUSION

Inasmuch as we believe that the district court committed no legal error, the judgment below will be *Affirmed.* Each party shall bear its own costs.