# United States Court of Appeals
## For the First Circuit

---

No. 00-1988

GARY WALTON,

Plaintiff, Appellant/Cross-Appellee,

v.

NALCO CHEMICAL COMPANY,

Defendant, Appellee/Cross-Appellant.

---

No. 00-2102

GARY WALTON,

Plaintiff, Appellant/Cross-Appellee,

v.

NALCO CHEMICAL COMPANY,

Defendant, Appellee/Cross-Appellant.

---

No. 00-2196

GARY WALTON,

Plaintiff, Appellant/Cross-Appellee,

v.

NALCO CHEMICAL COMPANY,

Defendant, Appellee/Cross-Appellant.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

_____

Before

Torruella, Circuit Judge,

Cyr, Senior Circuit Judge,

and Lynch, Circuit Judge.

_____

Daniel G. Lilley, with whom Daniel G. Lilley Law Offices, P.A. was on brief for plaintiff, appellant.
James B. Haddow, with whom Petruccelli & Martin, LLP was on brief for defendant, appellee.

_____

November 28, 2001
_____

3

**CYR, Senior Circuit Judge.** Plaintiff Gary Walton challenges various rulings which led the district court to dismiss his state-law claim for intentional infliction of emotional distress against his former employer, Nalco Chemical Company (Nalco), and to disallow his motion to amend the complaint to include a defamation claim under Maine law.

In its cross-appeal, Nalco challenges various evidentiary rulings, as well as the denial of its motion to dismiss Walton's pendant state-law age-discrimination claim under the Maine Human Rights Act ("MHRA"). We affirm the district court judgment.

## I

## BACKGROUND[1]

In 1977, Walton joined the staff at Nutmeg Technologies, Inc. ("Nutmeg"), selling water treatment chemicals and supplies to industrial and institutional customers in Maine. Between 1977 and 1994, his annual sales increased from $223,000 to more than $1,000,000. By the time Diversey Water Technologies, a Nalco subsidiary, announced its intention to

---

[1]All relevant facts are related in the light most favorable to Walton. See White v. N.H. Dep't of Corrections, 221 F.3d 254, 259 (1st Cir. 2000) (judgment-as-a-matter-of-law rulings are reviewed de novo, whereas the evidence and inferences to be drawn therefrom are viewed in the light most favorable to the nonmoving party).

acquire Nutmeg in October 1996, Walton then sixty years of age, was earning $61,000 a year as Nutmeg's highest paid Maine salesman.[2]

Prior to the time Nutmeg was actually acquired by Nalco, Walton had explained to Nalco Vice-Presidents Peter Hallson and Kenneth Yankowski that he wanted to retain his sales accounts and intended to continue working until at least age sixty-five. After Hallson and Yankowski acceded to his demands, Walton entered into an agreement not to compete with Nalco within his current sales territory for a period of eighteen months following any termination of his employment with Nalco. Whereupon Nalco agreed to disburse $5,500 to Walton as a retention bonus, provided that Walton remained employed by Nalco as of September 30, 1997.

In June 1997, however, Walton learned that Nalco had reassigned some of his sales accounts, including the third largest, to Troy Malbon, a thirty-one-year-old salesman previously supervised by Walton. On August 20, 1997, Walton met with Yankowski and Joseph Carney, Walton's direct supervisor, at their request. Yankowski inquired into Walton's financial condition, including the value of his residence and personal

_____

[2]Since Nalco acquired direct control of Diversey in December 1997, we simply refer to "Nalco."

5

property, then announced that all of Walton's remaining sales accounts would be transferred to Malbon, effective January 1998. Finally, Yankowski related two anecdotes about former Nalco employees who had been demoted or discharged at age sixty-two, explaining that Nalco had forced one of them to accept early retirement.

At the same time, Yankowski advised Walton that Nalco was not prepared to offer him any early-retirement incentive, suggesting instead that Walton accept part-time employment at $20,000 per year — less than one-third his salary at the time. Walton regarded Yankowski's remarks as warnings designed to compel him to accept early retirement. In due course, Walton retained counsel, who informed Nalco on October 3, 1997, that it had engaged in age discrimination. On October 8, 1997, Yankowski and Carney instructed Walton to bring additional information regarding his financial condition, so that his minimum financial needs could be calculated by Nalco with a possible view to tendering him a buy-out offer.[3]

At Yankowski's direction, during another meeting in November 1997, Walton was required to submit to an employee

---

[3]Around the same time, Yankowski stated in the presence of Ray Field, another Nalco employee:  "We can't have a man [Walton] in his sixties sitting on his accounts coasting.  We need to get a young rep in there selling business."

evaluation pursuant to a so-called Personnel Regeneration Form; Walton tested deficient in thirteen of its fifteen categories. Walton declined to sign the written evaluation and rejected the proffered employment contract,[4] after informing Nalco Vice-President Richard Murphy, in writing, that he would not sign the new contract unless Nalco first met with his attorney to discuss the age-discrimination claims. During this period, Walton experienced emotional distress and even fantasized about suicide. In February 1998, Walton was discharged for refusing to sign the new employment contract tendered by Nalco.

The day after Walton's discharge, a Nalco employee came to the Walton home to reclaim a piece of testing equipment and the company car. After rebuffing Walton's request that he be allowed to retain the testing equipment for its "sentimental value," the Nalco employee repossessed both the testing equipment and the company car in the presence of Walton's family and neighbors. Less than sixty days passed before Walton was hired by a Nalco competitor and assigned to one of his former Maine sales districts.

Walton instituted suit in the United States District Court for the District of Maine, claiming violations of the Age

---

[4]All Diversey employees were tendered new contracts at the time the two firms merged.

7

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., and the fair employment provisions of the MHRA, Me. Rev. Stat. Ann. tit. 5, § 4571 et seq., as well as intentional infliction of emotional distress. Nalco counterclaimed that Walton had breached the noncompetition agreement by accepting employment with a Nalco competitor. In due course, the district court denied Walton's motion to amend the complaint to include a defamation claim, granted partial summary judgment to Nalco on the issue of Walton's liability under the counterclaim, and reserved for trial the issue of damages under the counterclaim.

At trial, Nalco's counterclaim was dismissed after all its evidence on damages had been excluded. The district court entered judgment as a matter of law for Nalco on the Walton state-law claim for intentional infliction of emotional distress. At the conclusion of the trial, the jury returned verdicts on the ADEA and MHRA claims, awarding Walton $57,872 in back pay, $250,000 for pain and suffering, and $1,250,000 in punitive damages. The district court reduced the total jury award to $357,872, consistent with the limitations prescribed in the ADEA and the MHRA.

## II

## DISCUSSION

### A. The Walton Appeal

## 1.   **The Intentional Infliction of Emotional Distress Claim**

Walton first contends that there was enough evidence to establish that Nalco intended to inflict emotional distress by discharging him.  Judgments entered as a matter of law are reviewed <u>de novo</u>, and will be affirmed "only if, after scrutinizing the proof and inferences derivable therefrom in the light most hospitable to [Walton], we determine that a reasonable factfinder could have reached but one conclusion: that [Nalco] w[as] entitled to judgment."  <u>Fleet Nat'l Bank</u> v. <u>Anchor Media Television, Inc.</u>, 45 F.3d 546, 552 (1st Cir. 1995).[5]

Walton had the burden to prove that

> (1) [Nalco] intentionally or recklessly inflicted severe emotional distress or was certain that such distress would result from [its] conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, and utterly intolerable in a civilized community; (3) [Nalco's] actions . . . caused [his] emotional distress; and (4) the emotional distress . . . was so severe that no reasonable [person] could be expected to endure it.

<u>Vogt</u> v. <u>Churchill</u>, 679 A.2d 522, 524 (Me. 1996) (internal citations and quotation marks omitted).  Moreover, it was

---

[5]As we conclude that there was insufficient evidence to support the "intentional infliction" claim, <u>see</u> <u>infra</u>, we need not discuss an alternative basis for its dismissal, <u>viz.</u>, that the MHRA preempts all claims for employment-related emotional distress.

necessary for the district court, in its "gatekeeper" role, to determine, in the first instance, "'whether [Nalco's] conduct may reasonably be regarded as so extreme and outrageous [as] to permit recovery.'" Champagne v. Mid-Maine Med. Ctr., 711 A.2d 842, 847 (Me. 1998) (citation omitted).

Walton insists that the evidence demonstrated the requisite "extreme and outrageous" conduct, in that Nalco (i) abused its position of authority, qua employer; (ii) threatened his livelihood and professional reputation by attempting to pressure him to accept a buy-out package; and (iii) subjected him to undue "humiliation" by, inter alia, transferring his sales accounts to a less experienced employee, promulgating a false and demeaning job-performance review, and repossessing company property from him in the presence of his family and neighbors.

The district court correctly ruled that Walton's claim[6]

---

[6]See, e.g., Staples v. Bangor Hydro-Elec. Co., 561 A.2d 499, 501 (Me. 1989) (holding that supervisor, who humiliated employee during staff meetings, demoted him without cause, and falsely accused him of professional incompetence, had not engaged in "extreme and outrageous" conduct); see also Green v. Me. Sch. Admin. Dist. No. 77, 52 F. Supp. 2d 98, 114 (D. Me. 1999) (noting that denial of tenure to teacher, though arguably violative of the retaliation provision in the MHRA, was not "extreme and outrageous"); Krennerich v. Town of Bristol, 943 F. Supp. 1345, 1356-57 (D. Me. 1996) (observing that an intentional-infliction claim, relying solely on wrongful termination in violation of municipal employee's due process rights, failed to meet "extreme and outrageous" standard).

10

should be dismissed because the evidence failed, as a matter of Maine law,[7] to demonstrate an intentional infliction of emotional distress.

## 2. The Motion to Amend

Walton next contends that the district court erred in denying, as untimely, his motions to amend his complaint — made immediately before and after trial — to include a defamation claim under Maine law. See Fed. R. Civ. P. 15(a), (b). We review only for abuse of discretion. See Kemper Ins. Cos. v. Fed. Express Corp., 252 F.3d 509, 512 (1st Cir. 2001); Quaker State Oil Ref. Corp. v. Garrity Oil Co., Inc., 884 F.2d 1510, 1517 (1st Cir. 1989) (trial court considering proposed amendment must "examine the totality of the circumstances and exercise sound discretion in light of the pertinent balance of equitable considerations"). Although "leave [to amend] shall be freely

---

[7]The cases Walton cites are factually inapposite and inconclusive. Two cases involved elderly parents' claims that their children had engaged in inhumane attempts to evict them from the family home after the title to the home had been conveyed to the children by the parents. See Moulton v. Moulton, 707 A.2d 74, 76 (Me. 1998); Latremore v. Latremore, 584 A.2d 626, 630 (Me. 1990). Such extreme conduct within a family plainly entailed the infliction of much greater emotional distress than that involved in the instant employer-employee relationship. The third case cited by Walton involved an ex-husband's unrelenting, seven-month campaign to have his former spouse's divorce attorney brought up on professional misconduct charges, and the placement of local newspaper ads publicizing those unfounded charges. See Vogt, 679 A.2d at 524.

11

given when justice so requires[,]" Fed. R. Civ. P. 15(a), "parties seeking the benefit of . . . [Rule 15(a)'s] liberality [must] exercise due diligence; unseemly delay, in combination with other factors, may warrant denial of a suggested amendment." Quaker State, 884 F.2d at 1517 (amendments may be foreclosed where movant's delay is "extreme" or unexplained).

The first motion to amend the Walton complaint was submitted eight months after the due date prescribed in the scheduling order, six months after discovery closed, and one week prior to the trial date initially established by the district court.[8] Yet Walton offered neither an explanation nor a justification for the inordinate delays, relying instead on the naked assertion that Nalco could not have been prejudiced.

Walton nonetheless insists that his post-trial motion to conform the complaint to the evidence is distinguishable, in that Nalco implicitly consented to the trial of his defamation claim. By way of example, Walton points to evidence that Nalco personnel falsely represented that he was incompetent, and

---

[8]Cf., e.g., Jordan v. Hawker Dayton Corp., 62 F.3d 29, 33 (1st Cir. 1995) (no abuse of discretion where amendment was filed four months after scheduling order deadline and a few days prior to close of discovery); Quaker State, 884 F.2d at 1517-18 (motion to amend filed within three weeks of deadline for filing summary judgment motions held untimely where "[t]he facts upon which the proposed [amendment] rested were known to [the movant] all along").

12

contends that falsity is an element of his defamation claim. His characterization misses the mark.

"'Consent to the trial of an issue may be implied if, during the trial, a party acquiesces in the introduction of evidence which is <u>relevant</u> <u>only</u> <u>to</u> <u>that</u> <u>issue</u>.'" <u>United States</u> v. <u>Davis</u>, 261 F.3d 1, 59-60 (1st Cir. 2001) (emphasis in original; citation omitted). In the present case, however, where evidence of the alleged falsifications by Nalco representatives was independently material to establish pretext on the Walton age-discrimination claims under the ADEA and MHRA, the district court did not abuse its discretion by denying Walton's amendatory motions.

**B. The Nalco Cross-Appeal**

**1. Proof of the Maine Human Rights Commission Charge**

The cross-appeal is predicated on the contention that Nalco was entitled to judgment as a matter of law, on the MHRA age-discrimination claim brought by Walton, because Maine law allows neither damages nor attorney fees unless the plaintiff "alleges and establishes" that the MHRC has taken final action on the administrative charge or issued a right-to-sue letter. <u>See</u> Me. Rev. Stat. Ann. tit. 5, § 4622 (1)(C); <u>see</u> <u>also</u> <u>Gordan</u>

13

v. Cummings, 756 A.2d 942, 944-45 (Me. 2000).[9]  The district court ruled that Nalco waived its contention by (i) failing to raise it, either in its answer or as an affirmative defense, and (ii) engaging in "trial by ambush" by withholding its objection until the close of Walton's evidence.

The Maine Supreme Judicial Court ("SJC") has yet to determine the proper allocation of burdens of proof under section 4622.  Consequently, we must make "an informed prophecy of what the [SJC] would do in the same situation," seeking "guidance in analogous state court decisions, persuasive adjudications by courts of sister states, learned treatises, and public policy considerations identified in state decisional law." Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1151 (1st Cir. 1996).  We review statutory interpretations de novo. See Laaman v. Warden, N.H. State Prison, 238 F.3d 14, 16 (1st Cir. 2001).

Section 4622, by its plain language, precludes any characterization of the MHRC exhaustion issue as a mere affirmative defense,[10] since it explicitly states that the

_____

[9]The Nalco cross-appeal, if successful, would reduce Walton's net recovery from $357,872 to $115,744, the maximum allowable under the ADEA. See 29 U.S.C. §§ 216, 626(b).

[10]Walton's citations to case law holding that various statutory limits on damages are affirmative defenses, which may be waived unless pleaded, are inapposite. See Jakobsen v. Mass.

14

plaintiff, rather than the defendant, must "plead[]" the requisite MHRC filing. Cf. Fed. R. Civ. P. 8.[11] On the other hand, the section 4622 requirement, strictly speaking, is not an element of the statutory age-discrimination claim, since it does not preclude a jury finding of discrimination, but merely limits the types of recovery available to prevailing plaintiffs.[12]

Since section 4622 more closely resembles a condition precedent, cf. Jensen v. Frank, 912 F.2d 517, 520 (1st Cir 1990) (noting that Title VII exhaustion requirement is "condition precedent" to suit); MHRC v. Local 1361, UPIU AFL-CIO, 383 A.2d 369, 375 (Me. 1978) (observing that Title VII case law may provide guidance in interpreting MHRA), it is governed by Fed. R. Civ. P. 9(c), see 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1302, (2d ed. 1987) ("[Rule

---

Port Auth., 520 F.2d 810, 813 (1st Cir. 1975). Unlike section 4622, statutory "caps" on damages do not depend upon any pre-suit conduct by the plaintiff, but merely delimit arbitrarily the maximum exposure to damages for any defendant.

[11]As the section 4622 requirement is nonjurisdictional, it may be waived. Cf. O'Rourke v. City of Providence, 235 F.3d 713, 725 (1st Cir. 2001) (noting that Title VII exhaustion requirement is nonjurisdictional). Here, however, the issue is whether Nalco waived the requirement.

[12]If section 4622 were an element of an MRHA claim, arguably Nalco could have delayed, until the close of Walton's evidence, before moving for a Rule 12(b)(6) dismissal, which may even be raised for the first time at trial. See Fed. R. Civ. P. 8 & 12(h)(2).

15

9(c)] is applicable in all actions in the federal courts, even when the pleading practice in the state in which the court is sitting is different.").

Federal Rule of Civil Procedure 9(c) provides as follows:

> In pleading the performance or occurrence of conditions precedent, it is sufficient to aver generally that all conditions precedent have been performed or have occurred. A denial of performance or occurrence shall be made specifically and with particularity, but when so made the party pleading the performance or occurrence has the burden of proving it.[13]

Fed. R. Civ. P. 9(c). "Rule 9(c) has the effect of forcing defendant to raise the issue [of noncompliance with a condition precedent] whenever he believes there actually is a question about performance."  5 <u>Wright & Miller</u> § 1304; <u>id.</u> § 1302 ("Rule 9(c) is designed to eliminate the detailed and largely unnecessary averments that resulted under common law procedure, and to prevent nonmeritorious dismissals for failure to plead the fulfillment of conditions precedent that are not at issue in the suit.").

---

[13]Rule 9(c) governs not only contractual conditions precedent, but statutory conditions precedent as well, such as section 4622.  <u>See</u> 5 <u>Wright & Miller</u> § 1303 n.1; <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Weir</u> v. <u>United States</u>, 310 F.2d 149, 155 (8th Cir. 1962); <u>cf.</u> <u>Vasys</u> v. <u>Metro. Dist. Comm'n</u>, 438 N.E.2d 836, 840 n.4 (Mass. 1982).

16

As we have noted, supra, section 4622 explicitly requires that the plaintiff plead the requisite MHRC filing. Consequently, provided the complaint includes a general averment that all conditions precedent to suit or recovery have been met, and the "defendant does not deny the satisfaction of the preconditions specifically and with particularity, then the plaintiff's allegations are assumed admitted, and the defendant cannot later assert that a condition precedent has not been met." Jackson v. Seaboard Coast Line R.R. Co., 678 F.2d 992, 1010 (11th Cir. 1982).[14]

Accordingly, the appropriate inquiry in the present case is whether either the original or amended complaint included an adequate "general averment" that Walton had met all conditions precedent to the recovery of damages under the MHRA, even though neither complaint explicitly alleged that Walton had filed an MHRC charge. The original complaint alleged that Walton had satisfied "all conditions precedent to jurisdiction under the ADEA," including the timely filing of a discrimination

---

[14]Some courts have held that where a plaintiff utterly fails to plead a general averment, the defendant need not assert "failure of performance" as an affirmative defense in order to preserve the issue, but instead may raise the issue for the first time at trial. See 5 Wright & Miller § 1304; see also 2 James W. Moore, Moore's Federal Practice § 9.04[1] (3d ed. 1997) ("Neither Rule 9(c) nor Rule 8(a)(2) expressly requires that the performance or occurrence of conditions precedent be pled at all by a claimant.").

charge with the EEOC. Moreover, Count 1 — the ADEA claim — alleged "damages, including, but not limited to loss of income, loss of benefits, liquidated damages, attorneys' fees, costs, prejudgment interest, and declaratory and injunctive relief." Further, the prayer for relief in Count 1 demanded "all available remedies under the Maine Human Rights Act including reinstatement, back pay and penal damages . . . [and] such other relief and further relief as the Court deems just and proper."

Finally, the amended complaint made crystal clear that Count 1 of the original complaint had been brought under both the ADEA and the MHRA and that Walton was demanding "damages, including, but not limited to, loss of income, loss of benefits, liquidated damages, attorneys' fees, costs, prejudgment interest, and declaratory and injunctive relief." (Emphasis added.) Yet Nalco neither opposed the motion to amend the complaint, nor submitted an amended answer.[15]

---

[15]At trial, Nalco maintained that it had preserved its objection by pleading, in its original answer, the general defense of "failure to state a claim" pursuant to Rule 12(b)(6). See Fed. R. Civ. P. 12(b)(6). Absent any indication of the case-specific basis for the objection, however, its Rule 12(b)(6) objection was insufficient to place a condition precedent, such as section 4622, in issue. See EEOC v. Standard Forge & Axle Co., 496 F.2d 1392, 1395 (5th Cir. 1974) (noting that, where Title VII claimant carried burden under Rule 9(c), with general averment that "all conditions precedent to the institution of this lawsuit have been fulfilled[,]" defendant was not entitled to dismissal for want of more definite statement, pursuant to Rule 12(e), since defendant never denied

18

Under the liberal "notice pleading" standards, see Fed. R. Civ. P. 8(e)(1) & (f), these original and amended complaints met the "general averment" requirements prescribed by Rule 9(c). Although the complaints neither explicitly alleged compliance with all preconditions to recovery under the MHRA, nor with the requirement that an MHRC charge be filed, such compliance was plainly implicit.  Cf., e.g., Kiernan v. Zurich Cos., 150 F.3d 1120, 1123 (9th Cir. 1998) (holding it sufficient to satisfy "the loose guidelines of Rule 9(c)" that plaintiff allege that insurance policy was in "full force and effect," thus by implication that all conditions precedent to valid policy were met).

First, Walton alleged that he had filed an EEOC charge. Second, it is common practice to file simultaneous EEOC and MHRC

plaintiff's satisfaction of conditions precedent, "specifically and with particularity"); Vasys, 438 N.E.2d at 840 n.5 ("A bare allegation, in a responsive pleading, that the complaint fails to state a claim upon which relief can be granted (as was made by the defendant in its answer) would not be sufficient to preserve a claim" that plaintiff failed to satisfy a condition precedent.); see also Brooks v. Monroe Sys. for Bus., Inc., 873 F.2d 202, 205 (8th Cir. 1989) ("[M]ere assertion [in answer] of 'failure to state a claim' was not specific enough to [preserve] the issue" as to whether plaintiff failed to file an EEOC charge.); see also 5 Wright & Miller § 1304 ("A party who intends to controvert the claimant's general allegation of performance [of a condition precedent] thus is given the burden of identifying those conditions he believes are unfulfilled and wishes to put into issue; he cannot raise an issue of nonperformance by a general denial or by asserting that the plaintiff has failed to state a claim for relief.").

19

charges. Furthermore, by explicitly demanding MHRA damages, both in the original and amended complaints, Walton plainly placed Nalco on reasonable notice that he was claiming compliance with section 4622. Indeed, at trial Nalco's counsel acknowledged: "I'll be candid to say I did not have in mind this [affirmative defense] when I drafted the answer."[16] Consequently, the parties proceeded to trial with no hint whatsoever that section 4622 compliance was in dispute. Accordingly, the district court correctly rejected the motion for judgment as a matter of law on the MHRA claim.

### The Age-Discrimination Claim Evidence

Nalco contends that the evidence was insufficient to support the jury verdicts on the ADEA and MHRA claims. We review these Rule 50 motions de novo, drawing all reasonable inferences in favor of the prevailing party. See Negron v. Caleb Brett U.S.A., Inc., 212 F.3d 666, 668 (1st Cir. 2000). We must affirm unless the evidence was "so strongly and

---

[16]In addition, there is no serious dispute that Walton received a right-to-sue letter from the MHRC, as a copy was attached to his opposition. Accordingly, the Nalco cross-appeal reduces to the technical contentions that the letter was neither authenticated nor introduced in evidence. Thus, there was no substantial contention that Walton in fact failed to comply with section 4622. Cf. Harris v. Int'l Paper Co., 765 F. Supp. 1509, 1525 (D. Me. 1991) ("Civil penalties are not available in this case because Plaintiffs failed to file a complaint with the MHRC before bringing suit in this Court.") (emphasis added).

20

overwhelmingly" inconsistent with the verdicts that no reasonable jury could have returned them. See id. (citation omitted). This demanding standard was not met.

Nalco contends that Walton was discharged due to his refusal to sign the employment agreement tendered to him, and that his age was immaterial. The record evidence nonetheless reasonably permitted a contrary inference. Walton adduced competent evidence that Vice-President Yankowski, who attempted to intimidate Walton into accepting early retirement, had related several anecdotes regarding former employees of Walton's vintage who had been forced into early retirement by Nalco. More particularly, Yankowski stated to another Nalco employee: "We can't have a man in his sixties [viz., Walton] sitting on his accounts coasting. We need to get a young rep in there selling business." Walton thus presented competent evidence of an age-based animus by a Nalco decisionmaker. See Kirk v. Hitchcock Clinic, 261 F.3d 75, 79 (1st Cir. 2001) (noting that direct evidence of discriminatory animus may consist of "'statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision'") (citation omitted).

Moreover, Walton adduced evidence that Nalco maneuvered to establish a pretextual basis for discharging him. See

21

<u>Santiago-Ramos</u> v. <u>Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 56 (1st Cir. 2000) (noting that pretext may be established with evidence that "nondiscriminatory reasons were after-the-fact justifications, provided subsequent to the beginning of legal action"). After Nalco received a letter, from Walton's attorney, claiming age discrimination, Joseph Carney, Walton's direct supervisor, administered the so-called Personnel Regeneration Form to Walton at Yankowski's direction, which purported to show that Walton was <u>not</u> a competent salesman. At trial, however, Walton adduced compelling evidence of his competence as a salesman, evidence Nalco conveniently excluded from consideration in its final evaluation. For example, Nalco never received a client complaint regarding Walton's work performance. Moreover, Walton had long been the "highest grossing" salesman in his territory, and consistently enjoyed exceptional customer loyalty as evidenced by the fact that he had <u>never</u> lost a client in more than twenty years. Furthermore, his supervisor testified that Walton was "outstanding at building relationships with his customers." Additionally, rather than demonstrating laxity in developing new business, the sales volume generated by Walton increased by 92% <u>even</u> <u>as</u> <u>Nalco</u> <u>was</u> <u>transferring</u> <u>20%</u> <u>of</u> <u>Walton's</u> <u>client</u> <u>accounts</u> <u>to</u> <u>Malbon</u>, his designated replacement. Moreover, even though the performance

22

evaluation prepared by Nalco assigned Walton a "deficient" rating in regard to producing a business plan, it omitted mention that Walton already had been excluded from Nalco meetings at which new sales prospects were divided amongst his fellow sales associates. In addition, though Walton was rated "deficient" in recordkeeping, Nalco adduced no sales reports supporting its assessment.

Finally, given the record evidence before it, the jury reasonably could have found that Nalco orchestrated the Personnel Regeneration Form as pretextual support for its age-based decision to discharge Walton. See Santiago-Ramos, 217 F.3d at 56 (noting that memo setting forth legitimate grounds for discharging employee, prepared after it became apparent that former employee was initiating litigation, could be considered "pretextual post hoc justifications because [grounds] were only provided in anticipation of litigation").

2.  **Admission of Age-related Remark by Yankowski**

Nalco contends that the Yankowski statement — "[w]e can't have a man in his sixties sitting on his accounts coasting. . . . [w]e need to get a young rep in there selling new business" — was irrelevant to the issue of age animus, because Walton did not prove that Yankowski played any

decisionmaking role in the discharge.[17]

Evidentiary rulings are reviewed for abuse of discretion. Invest Almaz v. Temple-Inland Forest Prods. Corp., 243 F.3d 57, 69 (1st Cir. 2001). Evidence that discriminatory remarks were made by persons in a position to influence the challenged employment action may suffice to establish pretext. See, e.g., Straughn v. Delta Airlines, Inc., 250 F.3d 23, 35 (1st Cir. 2001). The jury was entitled to disbelieve the trial testimony that Richard Murphy unilaterally discharged Walton without consultation or input from Yankowski, who was one of Walton's superiors and the vice president for Nalco's eastern sales division. See Febres v. Challenger Caribbean Corp., 214 F.3d 57, 60-61 (1st Cir. 2000). Yankowski initiated not only the conversations regarding Walton's retirement plans, but also the telltale age-related anecdotes. Moreover, when Walton's attorney advised Yankowski of the age-discrimination claims, it was Yankowski who directed Carney to administer the so-called Personnel Regeneration Form to Walton, see supra, whose grossly inaccurate results strongly suggested a pretextual basis for the Walton discharge. Three months after the Personnel Regeneration

---

[17]By failing to renew its motion in limine at trial, Nalco waived its contention that the challenged testimony was unduly prejudicial, hence excludable under Federal Rule of Evidence 403. See O'Rourke v. City of Providence, 235 F.3d 713, 727 (1st Cir. 2001).

Form was administered to Walton, his employment was terminated.

The jury reasonably could have inferred, without difficulty, that Yankowski played a pivotal role in the termination decision implemented by Vice-President Murphy, and that the statement Yankowski made to Ray Field, see supra note 3, was both directly related and temporally proximate to the challenged employment action. See Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 583 (1st Cir. 1999) (observing that comment by decisionmaker — "I don't have to hire you locals or Cape Verdean people" — was not mere "stray remark" where employer refused to rehire people of Cape Verdean descent).[18] The district court did not abuse its discretion by admitting the Yankowski testimony.

### 3. **Exclusion of the "Lost Profits" Evidence**

Finally, Nalco contends that it was an abuse of discretion for the district court to exclude the evidence it proffered in support of its counterclaim for damages, viz., the profits allegedly lost due to Walton's post-discharge solicitation of former Nalco clients in violation of the noncompetition agreement. Specifically, Joseph Carney, the

---

[18]Although the exact date of the Yankowski remark is unclear, it occurred in 1997. Cf. McMillan v. Mass. SPCA, 140 F.3d 288, 301 (1st Cir. 1998) (finding that remarks made several years before challenged employment decision were temporally remote).

Nalco district sales manager for Maine, sought to tender a lay opinion as to the net profits lost by Nalco. The opinion was predicated exclusively upon Carney's lay review of corporate reports reflecting the gross profits generated by Nalco in its Maine sales district. Carney concededly possessed no personal or independent knowledge as to how the Nalco corporate data were compiled. Moreover, these corporate reports contained data pertaining exclusively to 1997, but none relating to the crucial 1998-99 period.

A trial court ruling excluding lay-opinion testimony is reviewed for a "clear abuse of discretion." United States v. Vega-Figueroa, 234 F.3d 744, 755 (1st Cir. 2000); see Fed. R. Evid. 701. As we have explained, Rule 701 "permits the rendering of lay opinion testimony when [it] is (a) 'rationally based upon the perception of the witness,' and (b) 'helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.'" Lynch v. City of Boston, 180 F.3d 1, 16 (1st Cir. 1999) (citation omitted). "[T]he modern trend favors the admission of opinion testimony provided it is well founded on personal knowledge and susceptible to cross-examination." Vega-Figueroa, 234 F.3d at 755. The district court acted well within its broad discretion in excluding the Carney opinion testimony, which was based neither

26

on personal knowledge nor apposite data.

**<u>Affirmed</u>**.